[Crim. No. 6654. In Bank. Oct. 6, 1960.]

THE PEOPLE, Respondent, v. RONALD RITTGER, Appellant.

Lawrence Shostak, under appointment by the Supreme Court, and Cominos & Shostak for Appellant.

Stanley Mosk, Attorney General, and Albert W. Harris, Jr., Deputy Attorney General, for Respondent.

SCHAUER, J.—Defendant Ronald Rittger appeals (by virtue of Pen. Code, § 1239, subd. (b)) from a judgment of death rendered on conviction of the first degree murder of Bobby Lee Wheeler, and from an order denying defendant's motion for new trial, or reduction of the class or degree of the offense or the penalty. Defendant was also charged with violation of section 4500 of the Penal Code (assault on Wheeler with malice aforethought, and with force likely to produce great bodily injury, by a prisoner undergoing a life sentence). The murder was charged as "a different offense from but connected in its commission with" the violation of section 4500. Defendant pleaded not guilty and not guilty by reason of insanity. He and counsel for both parties waived a jury trial. On motion of the prosecuting attorney the assault charge was dismissed in the interest of justice. The trial court found that defendant was guilty of first degree murder, that he was sane at the time of trial and the time of the commission of the offense, and that he should suffer the death penalty.

Defendant urges that (1) the evidence on the issue of guilt shows only manslaughter or, at most, second degree murder; (2) the evidence does not support the finding of legal sanity under the rule of *Queen* v. *M'Naughton* (1843), 4 St.Tr. (N.S.) 847, *M'Naughton's Case* (1843), 10 Clark & Fin. 200, 8 Eng.Rep. 718; in any event advancements in psychiatry require that such rule be changed and, since it was originally judicially announced in M'Naughton's Case and originally accepted in California by judicial rather than legislative action (*People* v. *Coffman* (1864), 24 Cal. 230, 235), the change should come from this court (contrary to the view last reiterated in *People* v. *Nash* (1959), 52 Cal.2d 36, 48 [4] [338 P.2d 416]) ; (3) this court has the power to reduce the penalty and, if it does not reverse the judgment or reduce the class or degree of homicide, it should modify the judgment to impose life imprisonment.

The state of defendant's mind, will, emotions, and conscience

at the time of the offense, and his long and discouraging history of criminal conduct and psychiatric problems, were fully and fairly explored at the trial. We have concluded that the evidence supports the determinations of the trial court; and we adhere to our decisions in previous cases that any change in the tests of legal insanity should come from the Legislature and that we should not assume the power to reduce the death penalty in a case such as this, where there is no error affecting the trial court's choice of punishment.

*The Willful, Deliberate, and Premeditated Murder of Wheeler.* At the time of the killing (April 29, 1959) defendant Rittger and his victim Wheeler were inmates of the State Correctional Facility at Soledad. Defendant had been transferred to this institution from Folsom State Prison about March 10, 1959. On April 29 at about 9:30 p.m., when the prisoners at Soledad were proceeding to their cells for "lock-up," Rittger stabbed Wheeler repeatedly, pursuing him as Wheeler attempted to escape. Defendant inflicted cuts on Wheeler's forehead and right shoulder, a wound in his back which penetrated his right lung and another wound in the back which penetrated the liver, lacerations on Wheeler's hands and arms, and a fatal wound which penetrated Wheeler's heart from the front of his chest. Wheeler made no threatening move before the attack by defendant, and had no weapon about his person or in his cell.

After the stabbing defendant waited quietly, knife in hand, until guards arrived and at their direction he dropped the knife. Although he appeared taut and agitated, he submitted without protest to a search and said, "I have no beef with you officers and I want no trouble." There were no other weapons in defendant's possession. He was taken at once to an office, where he appeared to relax. Commencing about 9:45 p.m., he voluntarily made the following statement which was reduced to writing and which defendant signed:

"About nine-thirty p.m. this date I stabbed this guy. He and I had had a fight in the shower . . . Monday, which would be 4-27-59, at about 7:25 a.m. . . . I walked inside the wing and he asked me what was I looking at and then called me [an obscene expression] . . . I told him I wasn't looking at you, man, what do you want to do, fight? The victim said yeh and then we went to the third tier shower room and exchanged a few blows. . . . [H]e hit me in the forehead and I swung back. There were a few more blows struck and then he said 'Later' and left. The fight was over. . . . Since that

time he has been constantly signifying [in prison parlance this means either "leading up to a fight or just trying to get your goat"], this inmate among other things has been constantly threatening me, saying that they was going to get me and take over the wing.

· "Then today, Wednesday, April 29, 1959, I was sitting in the wing before lunch, . . . and he came . . . and said, 'You better get your stuff because we're going to get it on.' [In prison parlance this means that defendant was told to arm himself because Wheeler proposed to fight with him.] . . . I said, 'I just came down from Folsom and did two and a half years in segregation. I beat a beef just like this, they tried to gas me once, and I want no more of it.' He got all chesty and [made an obscene and insulting remark] . . . I got hot and said, 'Okay, I'll get my stuff and then we'll see who is the sniveler. . . . ' [Defendant added a boastful, insulting comment] and I was too hot to say anything else. I went out and got my stuff, that is, a blade. I then went out in the yard. . . . Nothing further happened during the rest of the day but I kept watching him. . . .

"It was getting pretty close to 9 :00 o'clock p.m. I went to him and said, 'Why don't you forget about it?' He replied . . ., 'You wait, I'll see you tomorrow.' I split then. [This means, "I took off."] At 9 :30 p.m. lock-up he goes by and says, 'Don't lose no sleep.' . . . I said, 'Here's your sleeping pill, punk,' and I let him have it. I stabbed him once and he was turning, then I stabbed him again and it went in all the way and he screamed. Then he got away from me. Then I think I hit him in the back but I'm not sure. . . . He hit the floor, rolled over on his back, then I got down over him and . . . while he was pawing at me I stabbed him about four times. . . . He got up then and I swung real hard and stabbed him between the ribs on the side. When I pulled the knife out I saw the point was bent just a little bit. He ran again but ran out of gas after taking about twenty-five steps, he fell to the floor and stayed put."

While dictating the above quoted statement defendant appeared to have animosity toward Wheeler, but "about things in general or even to me [the interviewing officer] as an individual there was no animosity there or remorse or anything. Apparently no feeling."

The interviewing officer asked defendant when he first thought of killing Wheeler and defendant replied that "the idea really hadn't entered his mind until the fellow insisted

on getting his stuff, and he [defendant] decided, well, if it's going to go that route, why, better get with it." Defendant said that he did not know whether Wheeler was armed.

Another officer asked defendant, "Why [after Wheeler first fell] didn't you leave him alone?" and defendant replied, "I wanted to kill him." The intercommunication system announced the coroner's arrival and defendant said, "I guess he's dead. . . . Man, I finally killed somebody. . . . Ain't that something." Defendant "seemed to be proud of it," although he stated that "They'll probably give me the gas chamber. . . . They tried to the last time. . . . But I beat it." (The reference is to an assault committed by defendant while he was in San Quentin State Prison.)

Two psychiatrists, Dr. Francis and Dr. Fink, testified at the first stage of the trial as to whether defendant had the specific intent necessary to the crime of willful, deliberate, and premeditated murder. Each of these doctors, before he examined defendant, read prison records which included reports of defendant's behavior and opinions of other experts as to his mental condition over the years prior to the slaying. These records, introduced in evidence by defendant without objection, disclose the following history:

Defendant was nearly 23 years old at the time of the killing. He is of average or slightly above-average intelligence. When he was 5 years old he committed the first of a long series of acts described in his records as "burglaries" and "thefts." At the age of 7 he made his first official appearance in juvenile court on charges of burglary. He has been in a series of institutions (some designed for delinquent children, some mental hospitals, and various types of state prisons) during most of the time since he was 9 years old, and has been a difficult and often dangerous custodial problem. In 1953 he escaped from Mendocino State Hospital and committed acts which resulted in charges of robbery, rape, and two counts of burglary, to which he pleaded guilty. His acts of violence while he was institutionalized included the stabbing of a fellow inmate of Deuel Vocational Institute (an institution for offenders aged 18 to 25 years) in 1954, for which he was not prosecuted, an attack on a fellow inmate of San Quentin in 1955 which resulted in defendant's conviction of assault with intent to murder, and an attack on another inmate of San Quentin in 1956 which resulted in defendant's conviction of violation of section 4501 of the Penal Code (aggravated assault by a prisoner serving less than a life sentence).

Both Dr. Francis and Dr. Fink took into account the fact that defendant had spent most of his life in institutions, so that his standards were those of his milieu, not those of "the normal man who is brought up in a normal everyday give-and-take environment." The experts recognized that in prison society a statement such as Wheeler's "You better get your stuff because we're going to get it on" could under some circumstances be understood as a sincerely meant threat. But the doctors were of the opinion that Wheeler did not intend an actual threat and that defendant because of his abnormal mental condition misinterpreted or exaggerated the significance of Wheeler's statements and conduct. The doctors further considered the fact that a prisoner who was threatened by another inmate would be placed in custody for his own protection if he reported to prison officials, and expressed differing opinions why defendant did not seek official protection if he believed that he was threatened by Wheeler. Dr. Francis was of the view that defendant did not report to the authorities because "very definitely his status within the population [of the prison] would be lowered to the point he would be unable to sustain it. . . . If he admitted to any kind of going to the authorities . . ., he would be ganged up against." Dr. Fink was of the opinion that defendant did not request protection because "He couldn't. A man who is paranoid would never trust anyone."

Dr. Francis and Dr. Fink agreed that defendant was schizophrenic and paranoid, lacked conscience and a concept of the feelings of other persons, projected upon others his own feelings (e.g., when angry defendant thought that "it isn't that he becomes angry, it's people who become angry with him"), and could be called a "psychopathic" or "sociopathic" personality. As to the effect of these abnormalities on defendant's mental state at the time of the stabbing, however, the doctors were not in agreement. Dr. Francis testified that in his opinion defendant "had for some several hours previously concocted or planned to perform the act"; that defendant's reasons for the killing were "[a]ccording to his frame of thinking, rational . . . . His context of thinking was far from normal, but . . . within that context it is rational.

". . . I think he was extremely angry at the situation he had found himself in. . . . [H]e had to prove himself in the new institution, and he had been challenged. At least, as he thought it, he had been challenged. . . . He took up the chal-

lenge and because of his ways of thinking the matter of killing doesn't mean much to him . . . .

"I think the crime was committed under a mental derangement which in the psychiatric term would be a psychosis . . . of a chronic nature. But it was no acute confusional state of psychosis at all. It was simply a misinterpretation of his situation and lack of understanding of other human beings. He felt he had a right to kill somebody, that's all."

According to Dr. Francis, "Throughout the previous actions and episodes [described in defendant's prison records and by defendant himself in his interview with the doctor], far from any great panic or excitement, he sat down sometimes a matter of days and thought about it, made his plans, made his deliberations, and then committed his action. True, all in the context of the schizophrenic paranoid, but not in any context of fear. . . .

"He imputes to others the cause of any upset inside of him. So it naturally follows that when this victim made any kind of altercation with him he took that to mean that he was being threatened, that there was a challenge. . . . All this is delusion. It is defensive on his part as he would have to do something about it. . . . His defense mechanism was that he would then be justified in his anger to concoct damage done to another. He would plot and plan and carry out the act. Now, in all that, it's under a delusion, all right; but it is not a panic. It is acting under fear but it is not a panic."

As previously stated, Dr. Fink's views of defendant's mental processes leading up to and at the time of the homicide differed from the foregoing views of Dr. Francis. Dr. Fink concluded that at the time of the slaying defendant did not and could not entertain "malice aforethought"; by the just-quoted phrase, the doctor testified, "I mean that at the time of the commission of the crime he would be rational, he would know the meaning and the significance of what he is doing, he would understand the situation and he would be doing . . . a criminal act, with evil intent." Rather, Dr. Fink concluded, defendant acted in a state of panic, as a result of "paranoid schizophrenic reactions which culminate[d] in an impulsive, uncontrollable act of violence, committed as it were without legal intent, almost in the manner of a somnambulist but differing from the latter in that he, Rittger, is able to see himself acting in his uncontrollable behavior." Dr. Fink gave the following description of this killing and of previous instances when defendant had vio-

lently attacked other prisoners: "[H]e feels a tension mounting up within him which becomes greater and greater until he can no longer control himself. At the same time he becomes more and more convinced that his life is in danger, that some prisoner or group of prisoners intend to murder him. He secures some kind of weapon to use in self-defense, but the weapon itself becomes a threat to his safety. He wants to get rid of it before he is caught with a concealed weapon in his possession. As his tension mounts and his paranoid ideas assume more vivid form he finally loses control of himself. As he puts it, 'I see myself doing this, attacking this fellow, but it's as if I am someone else and I can't stop the me that's hitting him or knifing him. The me that's watching doesn't want to do it and the me that's doing it is acting like something mechanical, like a robot or a machine.'"

In addition to the foregoing evidence which was received at the first stage of the trial, the court at the hearing of defendant's motion for new trial or reduction of the offense or penalty properly stated that "in the interests of justice" it was considering the evidence introduced at the two later phases of the trifurcated trial. On this appeal, at defendant's request, we have similarly considered all the evidence introduced throughout the trial in reviewing defendant's attacks on the sufficiency of the evidence of specific intent. Defendant himself first took the stand at the trial as to penalty. His description of his mental state at the time of the stabbing differs from that which he gave immediately after the occurrence. He testified that at "lock-up time" Wheeler "went by me . . . and I told myself, 'He's not going to do nothing now, forget about it.' . . . I was nervous, my heart was beating real hard. . . . I thought first when he come he was going to start it but he didn't. . . . I started to go in my cell and the next thing I remember I was at his cell, tapping him on the shoulder, and I had a knife in my hand. . . . He turned around and he hit me. . . . I had the knife out like this and I hit him. . . . I might have cut him in the forehead . . . I remember him pushing me out of the way and running out the cell and then he went across the wing and I went after him and he fell down. He got back up and he run and I stopped . . . I knew I had stabbed him but I didn't know where or anything like that. . . . I never thought about killing him."

Defendant urges that the trial court, although it received the psychiatric evidence relating to whether he entertained the specific mental state necessary to constitute either

degree of murder, "refused to consider and weigh" such evidence. At the end of the first stage of the trial, however, the court expressly stated that "The Court has heard the evidence and listened to the arguments, read all exhibits, and the Court has come to the conclusion that the defendant is guilty of murder in the first degree . . . ." It would be absurd to suggest that the court "heard," "listened," and "read," but did not "consider and weigh." ▮ Furthermore, as the court stated at the time of the motion for new trial, concerning the expert testimony as to specific intent, "[D]espite the opinions along that line, the trier of the facts still draws his own conclusion from the facts, even if that conclusion be opposite to those who take the stand and apparently are qualified as experts upon the subject. It's still the trier of the fact who doesn't have to accept it if it doesn't ring true to him. . . ." ▮ The case of *People* v. *Gorshen* (1959), 51 Cal.2d 716, 735 [336 P.2d 492], illustrates the correctness of the view that, where there is nonexpert testimony which will support a finding of the specific intent necessary to constitute an offense, even if all the expert testimony is that such intent was lacking, there is no requirement of law that the expert testimony should raise a reasonable doubt in the mind of the trier of fact.

▮ In the context of the present record, inferences of willfulness, deliberation, and premeditation are supported by defendant's own description of the killing and the events which led up to it, quoted *ante,* pp. 724, 725, and confirmed by the testimony of other inmates who witnessed the stabbing. Particularly significant are defendant's persistence in the ultimately fatal attack (see *People* v. *Cartier* (1960), *ante,* pp. 300, 307, 308 [5 Cal.Rptr. 573, 353 P.2d 293]; *People* v. *Honeycutt* (1946), 29 Cal.2d 52, 62 [7] [172 P.2d 698]), his ability to accurately describe the events (see *People* v. *Cooper* (1960), 53 Cal.2d 755, 766 [3 Cal.Rptr. 148, 349 P.2d 964]), his preparations as to time, place, and means, and his awareness of the consequences of his action (see *People* v. *Love* (1960), 53 Cal.2d 843, 849, 851 [3] [3 Cal.Rptr. 665, 350 P.2d 705]; *People* v. *Cooper, supra,* p. 766 of 53 Cal.2d). Furthermore, here there was expert testimony, the opinion of Dr. Francis, that the stabbing was "coolly calculated," the result of "deliberations" and "plans." The trier of fact could conclude that in so describing defendant's mental processes Dr. Francis had in mind the sort of first degree murder here pertinent as that crime is defined by law; *i.e.,* "a willful

act characterized by the presence of malice aforethought and by a deliberate and premeditated intent to kill,'' with the words ''deliberate'' and ''premeditated'' having ''their common, well-known dictionary meaning'' (*People* v. *Bender* (1945), 27 Cal.2d 164, 182 [17], 183 [19] [163 P.2d 8]).

▉ Defendant would deny credence to the opinion of Dr. Francis concerning deliberation because that expert shared many of the opinions of Dr. Fink as to defendant's being mentally ill, testified that defendant made and carried out his plans ''under a delusion,'' and expressed inconsistent opinions as to whether he acted ''under fear.'' But the trier of fact was not required to, and this court in its reviewing function cannot properly, pick out and accept isolated phrases of expert testimony on which defendant relies and disbelieve the conclusion of the expert as to specific intent because his testimony contains some apparently inconsistent expressions.

▉ Defendant was properly allowed to present fully to the trial court evidence tending to support his factual contentions, including the contention similar to that presented in *People* v. *Wells* (1949), 33 Cal.2d 330, 357 [202 P.2d 53], that defendant's overt act was not done with ''malice aforethought'' but, because of his abnormal condition, ''was actuated by fear, genuine although unfounded in ultimate truth.'' ▉ The conflicting evidence can reasonably be resolved to justify the trial court's determination as to specific intent; the fact that it might also be reasonably resolved to support defendant's contention does not warrant interference with that determination. (*People* v. *Love* (1960), *supra,* 53 Cal.2d 843, 850 [1, 2].)

*Legal Insanity.* ▉ The basic rule of *Queen* v. *M'Naughton* (1843), *supra,* 4 St.Tr. (N.S.) 847, 931, *M'Naughton's Case* (1843), 10 Clark & Fin. 200, 210, 8 Eng. Rep. 718, 722, as stated by this court last year (in *People* v. *Nash* (1959), *supra,* 52 Cal.2d 36, 39, footnote 1) is that a person is, in law, incapable of crime if ''at the time the accused committed the act he was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of his act or, if he did know it, that he did not know that he was doing what was wrong.''

Also pertinent here are the following question of the Lords and answer of the judges in M'Naughton's Case (p. 211 of 10 Clark & Fin., p. 723 of 8 Eng. Rep.) : '' 'If a person under an insane delusion as to existing facts, commits an offence in consequence thereof, is he thereby excused?' To which ques-

tion the answer must of course depend on the nature of the delusion: but, making the . . . assumption . . . that he labours under . . . partial delusion only, and is not in other respects insane, we think he must be considered in the same situation as to responsibility as if the facts with respect to which the delusion exists were real. For example, if under the influence of his delusion he supposes another man to be in the act of attempting to take away his life, and he kills that man, as he supposes, in self-defence, he would be exempt from punishment. If his delusion was that the deceased had inflicted a serious injury to his character and fortune, and he killed him in revenge for such supposed injury, he would be liable to punishment.'' (See *People* v. *Hubert* (1897), 119 Cal. 216, 221 [51 P. 329, 63 Am.St.Rep. 72] ; *People* v. *Griffith* (1905), 146 Cal. 339, 346 [80 P. 68] ; *People* v. *Troche* (1928), 206 Cal. 35, 46 [7] [273 P. 767].)

The history of the judicial and implicit legislative acceptance of M'Naughton in this state is related in the Nash case, *supra*, pp. 43-48 of 52 Cal.2d. ▮▮ Nothing which defendant says in the present case convinces us that we should depart from the view that, whatever we may think of the theoretic soundness of the M'Naughton tests, such tests have in effect become an integral part of the legislative scheme for the appraisal of criminal responsibility in California and any change therein should come from the Legislature.

Defendant urges that, under the M'Naughton view, the evidence as a matter of law is insufficient to support the finding of legal sanity. In this regard the evidence, in addition to that which had been received at the first stage of the trial, included further testimony of Dr. Fink and Dr. Francis, the testimony of two alienists who were appointed by the court because of defendant's plea of not guilty by reason of insanity (Pen. Code, § 1027), the testimony of defendant's parents, and further records containing opinions of experts at various institutions as to defendant's mental state at times prior to the subject homicide.

The court-appointed psychiatrists, Dr. Johnson and Dr. Reeves, examined defendant together for about an hour or two; unlike Dr. Fink and Dr. Francis, they did not review the records containing previous evaluations of defendant's mental state. Dr. Johnson and Dr. Reeves each testified briefly that (in the words of Dr. Johnson, substantially the same as those of Dr. Reeves) defendant ''had no mental disease or defect which would prevent him from knowing the nature and

quality of his action or knowing that what he did was wrong, and that he was . . . then [at the time of the homicide] and presently sane'' and that there was ''no evidence of any mental disorder throughout the examination. My examination revealed him to be normal mentally; he was rational; his conversation was coherent and real. His memory was good. He spoke at the normal rate and he conversed in a normal manner. His mood throughout the examination was what I thought conformed to the normal.''

Dr. Francis testified that in his opinion defendant ''knew right from wrong and . . . knew the nature and quality of the act''; defendant because of his mental illness considered that ''he had a right to defend himself; [but] he did not consider the act right. There is a conflict of terms there. . . . [H]e knew what he should do was right or wrong, whether it was good behavior or bad behavior. But then he chose to take the other path. 'I have a right of another sense altogether,' is what he said.''

Dr. Fink, however, was of the opinion that defendant, because of mental derangement, ''could not possibly appreciate the true nature of his action . . ., he could not distinguish right from wrong''; defendant ''felt that he was completely justified in attacking Mr. Wheeler because he was acting in self-defense.''

Defendant expressly purports to recognize that, as pointed out in *People* v. *Berry* (1955), 44 Cal.2d 426, 432 [6] [282 P.2d 861], ''the weight to be accorded to the medical expert testimony . . . is a question of fact for the jury's [here, the trial judge's] determination.'' Yet defendant urges that the examination of the court-appointed alienists was so perfunctory that, as a matter of law, no credence should be given their conclusions, particularly in view of the fact that not only Dr. Fink and Dr. Francis but also all other psychiatrists who had examined defendant for some years before the killing were of the opinion that he suffered from some form of mental illness. And defendant argues that the conclusion of Dr. Francis that defendant knew the wrongfulness of his conduct within the meaning of M'Naughton's Case is legally unsupportable because that expert also testified that defendant, within the context of his delusional thinking, believed that the stabbing was ''justified,'' that he ''had a right to defend himself'' and in effect said to his victim, ''you're going to kill me, and that is why I have to defend myself.''

Manifestly, since we must view the evidence favor-

able to supporting the judgment (*People* v. *Rankin* (1937), 10 Cal.2d 198, 200 [74 P.2d 71]), we cannot reject the opinions of the court-appointed alienists, despite the seeming superficiality of their inquiry into defendant's sanity. Nor can we reinterpret the testimony of Dr. Francis to destroy his conclusion. Contrary to defendant's argument, it does not appear that the latter witness was of the opinion that defendant mistakenly believed that the objective situation was such that he needed to and could commit justifiable homicide in self-defense as those terms are used in the law (Pen. Code, §§ 197, 198) ; rather, Dr. Francis' testimony can reasonably be understood to mean that in his opinion defendant, although recognizing that his conduct did not accord with social standards of right and legal standards of justification, felt that Wheeler might attack him at some future time and therefore, according to defendant's personal, prison-influenced standards, he was "justified" in eliminating Wheeler. ▮▮▮▮ The fact that a defendant claims and believes that his acts are justifiable according to his own distorted standards does not compel a finding of legal insanity. (See *People* v. *Nash* (1959), *supra*, 52 Cal.2d 36, 41, 54 [9].) This is necessarily so if organized society is to formulate standards of conduct and responsibility deemed essential to its preservation or welfare, and to require compliance, within tolerances, with those standards.

*Reduction of Penalty.* No error contributed to the choice of penalty; defendant's appeal in this regard, like his argument in the trial court, is addressed to the suitability, not the correctness, of the punishment. The burden of his argument is that he is in effect a victim of the institutions where he was confined over the years, where his problems were repeatedly recognized in official reports, but where he was never given professional aid or treatment directed to the solution of those problems.

▮▮▮ We have consistently and repeatedly taken the view that "The trier of fact has sole responsibility and absolute discretion to select the penalty for first degree murder. [Citations.] ▮▮▮ This court cannot substitute its judgment as to choice of punishment [citation] even where we may doubt the appropriateness of the death penalty [citations]." (*People* v. *Linden* (1959), 52 Cal.2d 1, 26 [28-29] [338 P.2d 397] ; accord, *People* v. *Cash* (1959), 52 Cal.2d 841, 845 [1] [345 P.2d 462].) ▮▮▮ Only the trial court has power to reduce the punishment originally selected by the trier of fact (*People*

v. *Moore* (1960), 53 Cal.2d 451, 454 [2] [2 Cal.Rptr. 6, 348 P.2d 584]) and in this case it advisedly refused to exercise such power. We adhere to the view of the foregoing cases and the decisions cited therein. *People* v. *Jackson* (1955), 44 Cal.2d 511, 517 [1], 521 [282 P.2d 898], relied on by defendant as asserting the power of this court to reduce the death penalty, does not stand for so broad a proposition. This court's reversal of judgments sentencing the defendants there, respectively, to death and life imprisonment without possibility of parole, with directions to sentence them to life imprisonment, was designed to correct punishments which as a matter of law were too severe; that is, the evidence showed only kidnaping for ransom without bodily harm, whereas the more severe punishments were statutorily authorized (Pen. Code, § 209) only where the victim suffered bodily harm; furthermore, elements of unfairness in the trial judge's conduct of the case contributed to the jury's determination that defendants were guilty of the more serious offense. Here, on the other hand, defendant was fairly tried, properly convicted, and the selection of the death penalty was within the discretion of the trial court.

For the reasons above stated, the judgment and order appealed from are affirmed.

Gibson, C. J., Traynor, J., McComb, J., Peters, J., White, J., and Dooling, J., concurred.

Appellant's petition for a rehearing was denied November 1, 1960.