[No. B163612. Second Dist., Div. One. Mar. 30, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
DAMASCIO IBARRA TORRES, Defendant and Appellant.

COUNSEL

Marilyn Drath, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Susan D. Martynec and Ellen Birnbaum Kehr, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**SPENCER, P. J.—**

## INTRODUCTION

Defendant Damascio Ibarra Torres appeals from a judgment of conviction entered after a jury trial. Defendant was convicted of three counts of attempted murder (Pen. Code, §§ 187, subd. (a), 664), during which he personally used a firearm (*id.*, § 12022.5) and inflicted great bodily injury on his victims (*id.*, § 12022.7). He also was convicted of two counts of false imprisonment (*id.*, § 210.5), during one of which he personally used a firearm (*id.*, § 12022.5). The trial court sentenced defendant to life imprisonment with the possibility of parole on the attempted murder counts, with an additional 11 years for the firearm use and great bodily injury enhancements. The trial

court sentenced defendant to a consecutive determinate term of 14 years eight months on the false imprisonment counts and firearm enhancement.

This appeal is from defendant's second trial in this case. Defendant previously was convicted of these same offenses. He appealed, and this court affirmed his conviction. (*People v. Torres* (July 28, 1995, B085270) [nonpub. opn.].)[1] He then filed a petition for writ of habeas corpus in the federal district court. The court granted his petition, and that decision was upheld on appeal. (*Torres v. Prunty* (9th Cir. 2000) 223 F.3d 1103.)[2] Defendant was retried, convicted, and this appeal followed.

Defendant challenges the instruction on insanity and the finding he was sane at the time he committed the instant crimes. He claims ineffective assistance of counsel at the sanity hearing. He also challenges the sentence he received. We conclude there was prejudicial instructional error, requiring reversal of the sanity finding. We also find sentencing error.

## FACTS

*The Shootings*

At about noon on February 8, 1993, defendant walked into the urgent care area at Los Angeles County USC Medical Center. He was dressed in camouflage clothes and dark glasses. He carried three guns. Yelling, he asked where the doctors were, claiming that he had AIDS, was sick and dying.

Doctors Glenn Rogers, Paul Kaszubowsky and Richard May were working as screeners in the urgent care area.[3] Defendant began shooting at them, firing a total of seven times.

Defendant shot Dr. Rogers in the shoulder. The bullet was deflected by Dr. Rogers's collarbone; it traveled through his lung and out his back. The doctor

---

[1] At the first trial, defendant was identified as Damacio Ybarra Torres.

[2] The petition was granted on the ground the original trial court erred in failing to hold a hearing as to defendant's competence to stand trial. (*Torres v. Prunty, supra,* 223 F.3d at p. 1109.) We held there was no substantial evidence as to defendant's incompetence to stand trial, so the trial court was not required to hold a competency hearing. (*People v. Torres, supra,* B085270.)

During defendant's second trial, two competency hearings were held. After both hearings, the court declared defendant competent to stand trial.

[3] Screeners interviewed patients coming into urgent care to determine the nature and seriousness of their problems. They worked at desks in the waiting room area, while other doctors examined patients in curtained cubicles.

Dr. Rogers had seen defendant twice previously in the urgent care area. He had recommended that defendant seek mental health treatment, but defendant stated that he did not have a mental health problem or need treatment.

ran to the emergency room, where he received medical assistance. He was hospitalized for five days and was able to return to practice in about six weeks.

Defendant shot Dr. Kaszubowsky in the forearm. The bullet shattered the bones and severed the medial nerve in Dr. Kaszubowsky's forearm, as well as grazing his head. The doctor ran from the room and was helped to the surgical area. He required two surgeries on his arm, was hospitalized for a week and suffered some permanent impairment of his ability to use his arm. He also suffered psychological problems and was unable to return to work for four years.

Dr. May was shot in the head, arm and abdomen. He lost consciousness and was taken to the emergency room by a nurse and a security guard. He was unconscious for several days and hospitalized for six weeks. He lost a portion of his brain, and had bone and bullet fragments lodged in his brain. He suffered some visual loss, inner ear problems, partial loss of his voice, impairment of his arm, herniated discs in his back and posttraumatic stress disorder. He required two surgeries after his initial hospitalization, was under psychiatric care and was able to work only part time.

After shooting the three doctors, defendant demanded to know where the rest of the doctors were. He began looking in the cubicles. He encountered two nurses working there. He told them he did not want nurses, he wanted doctors.

Dr. Ann Tournay, who was examining a patient in a cubicle, heard the shooting and defendant's statement that he wanted doctors. She removed her badge identifying her as a doctor. When defendant entered her cubicle, he was holding a woman, Lillian Bragg (Bragg) by the neck. He asked Dr. Tournay if she was a doctor. She said she was a nurse. He said, "Don't give me that, you're a doctor. You're British. I like the British. I like 'Are You Being Served?' " He handcuffed Dr. Tournay to Bragg. About that point, armed security guards arrived, but defendant pointed a gun at the women's heads, and the guards left.

Defendant continued looking for doctors for about an hour. He then barricaded himself, Dr. Tournay and Bragg inside a room. He had Dr. Tournay look out the window and report to him about what was happening outside. He also had her communicate with the police through the window. After several hours, defendant released Dr. Tournay and Bragg. Defendant surrendered himself to the police and was arrested about 5:00 p.m.

*Defendant's Statements Regarding His Actions*

During negotiations with the police before he was arrested, defendant complained that he was a victim of a medical conspiracy and had been used as a "human guinea pig." He had been injected with a mysterious virus that was killing him. He was rotting alive and giving off a stench. When he went to the doctors to get help with his physical ailments, they told him to go to a mental hospital.

After his arrest, defendant told the police in an interview that USC had used him as a guinea pig in a medical experiment. In 1982, a doctor gave him an injection then called him a "sorry bastard." Since the injection, defendant could not digest his food and had no control over his intestines. He smelled so bad that he could not go into a store or ride the bus, and he was afraid he would be kicked out of the hotel in which he lived. The doctors wanted him to die on the streets like a dog. Every time he went to the hospital, the doctors refused to assist him and instead told him to go to a mental hospital. The doctors also had sent out a computer message to other hospitals to tell them that he should not receive medical assistance.

Defendant described shooting the doctors. He explained he wanted to get them for the way they had treated him over the last 10 years. He "wanted revenge. It's just that simple."

Defendant told the police he had left written plans in his hotel room. He planned to shoot the screening doctors because they treated him like an animal, as though he was not human. He explained that he had written out the plans so that, if the police stopped him before he killed the doctors, they could see the plans and defendant could receive help. He hoped he would be stopped before he shot the doctors, so that he could receive help, but if he was not stopped, he planned to shoot the doctors.

Documents found in defendant's hotel room identified him as a "Victim of a Medical Conspiracy." The documents explained that defendant was being used as a guinea pig in a secret experiment. He was being systematically refused medical treatment by doctors at Los Angeles County USC Medical Center and told to go to a mental hospital, even though he was physically ill, not mentally ill. The doctors had injected him with "a deadly experiment," possibly the AIDS virus. Defendant was leaking fecal matter and gave off a terrible stench, preventing him from walking down the street or getting on a bus. He was dying and he would be found under a bridge, dead as a dog. The doctors would not help him because they were guilty.

One document listed 34 steps for defendant to take. They included "shoot all three screeners, grab two nurse hostages, shoot all doctors, no black

hostages, don't shoot nurses or people, shoot doctors only, return to a cubicle and stay there all-day." Defendant also stated in the document, "They are going to pay for treating me like a laboratory animal. They injected me with AIDS and all they want is to sit back and watch me die."

*Psychiatric Evidence*

Dr. Gregory Cohen, a psychiatrist, was appointed to examine defendant and testified for the defense. He reviewed psychiatric evaluations of defendant by Dr. Woodard in 1986, by Dr. Wells in 1993, by Dr. Kaushal Sharma in 1994, and by Dr. Magpayo in 1998. He also reviewed police reports, transcripts of defendant's interview with the police following the shootings, transcripts of other court proceedings and tapes of earlier interviews with defendant. He reviewed defendant's notes and he interviewed defendant in 2000.

Dr. Cohen noted that defendant was diagnosed with chronic borderline schizophrenia in 1986, when he underwent a Social Security disability evaluation. Dr. Magpayo diagnosed defendant with chronic paranoid schizophrenia in 1988.

Dr. Cohen believed that defendant was suffering from a paranoid delusional disorder. At the time of the shootings, defendant was delusional and had a fixed false belief of persecution. He also had somatic delusions that he was suffering from severe medical illnesses which, in reality, did not exist. Defendant's delusions remained constant over the years—before, during and after the shootings. These delusions involved a conspiracy by doctors at USC to use him in an experiment, resulting in the illnesses and horrible stench he believed he had. The delusions led to defendant's actions on February 8, 1993.

In Dr. Cohen's view, defendant's disorder was so severe that he believed he was acting in self-defense when he shot the doctors at Los Angeles County USC Medical Center. This view was based on a videotaped interview of defendant by Dr. Mohandie in 1999. In this interview, defendant stated, "I became like a vigilante and I shouldn't have done that. I—I just—but that's the way I was then. I am not against—I am not for paybacks anymore, but it is too late now. All I can do is just pay the price, . . . my debt to society." Defendant also explained that the doctors at USC "just kept at it, at me and at me for ten years. Ten years. From the beginning of the injection to when that thing happened, it is like they just kept at it, kept at it until I just struck back." These statements supported Dr. Cohen's "opinion that [defendant] believes he has been subjected to experiments by who he sees as being very evil doctors, for years and years and years, and that it led up to the shootings,

and that part of . . . [defendant's] mental state involved vengeance, as well as defending himself and defending others." Defendant wanted to expose what the doctors were doing to help both himself and other poor, mentally ill and retarded people who were victims of the doctors' experiments.

Dr. Kory Knapke, another psychiatrist, also was appointed to examine defendant and testified for the defense. He also reviewed past interviews and reports and transcripts from prior court proceedings. He interviewed defendant for two hours in November 2000.

Dr. Knapke opined defendant was suffering from paranoid schizophrenia,[4] but defendant did not believe he was mentally ill. At the time of the shootings, defendant was paranoid and delusional and was experiencing a psychotic episode. Defendant believed he was ridding the world of evil and God would approve of his actions.

Dr. Sharma, a forensic psychiatrist, testified on behalf of the prosecution. Dr. Sharma reviewed Dr. Magpayo's report, police reports, defendant's letter, and some audiotapes and videotapes. He met with defendant once in 1993, twice in 1994, and in June and November of 2000.

Dr. Sharma believed defendant was suffering from a paranoid and somatic delusional disorder. He believed his diagnosis was more accurate than Dr. Knapke's, in that he had interviewed defendant earlier, when defendant was at the height of his illness. Defendant's condition had improved since 1993. In 1993, defendant had a severe mental disorder which impaired his judgment.

Dr. Sharma did not agree that defendant shot the doctors in self-defense, to protect others or to reveal what had been done to him. He believed defendant's primary motive was revenge. This belief was based on his discussions with defendant, defendant's to-do list, statements during negotiations and statements to police officers after his arrest.

*Sanity Phase—Defense*

Dr. Cohen believed that defendant was legally insane when he shot the doctors. Defendant at that time was unable to understand the wrongfulness of his conduct. Defendant believed he was eliminating evil, and God was on his side. His acts were justified in order to save himself and others. He had no other choice but to act as he did.

---

[4] Dr. Knapke disagreed with other doctors, who diagnosed defendant as suffering from a delusional disorder.

In Dr. Knapke's view, defendant was legally insane at the time of the shootings. Defendant was psychotic and did not know that his actions were wrong. He believed he was eliminating evil, exposing the doctors' illegal experimentation and defending himself. He believed he had no choice but to do what he did. Although defendant knew killing was wrong, he believed that by stopping evil he was doing something right.

Dr. Jean Carlin, a psychologist, was appointed to examine defendant in December 1999. She reviewed defendant's written notes and the reports of Dr. Wells and Dr. Sharma. She concluded that defendant was suffering from a paranoid-type delusional disorder. She also opined that defendant was legally insane at the time of the shootings.

According to Dr. Carlin, defendant knew what he was doing and that society would regard his actions as wrong. Defendant did not understand that his actions were wrong, however. He believed they were morally correct. He believed he was helping God by taking action against evildoers.

*Prosecution*

Dr. Tournay testified that, while defendant held her hostage, he seemed calm and normal so long as he was not talking about the conspiracy against him. As to whether defendant acknowledged the wrongfulness of his conduct, she stated that defendant talked about a plan to go to Alaska, then stated, "I guess I won't be going there after what I have done." After defendant's arrest, he wrote to Dr. Tournay to apologize, acknowledging that he had to be held accountable for what he had done.

Dr. Rogers had contact with defendant while defendant was incarcerated. Defendant apologized for shooting the doctor and acknowledged it was a stupid thing to do.

Dr. Sharma believed defendant was legally sane at the time of the shootings. Defendant both understood the nature and quality of his acts and understood the wrongfulness of his acts. Dr. Sharma disagreed with the defense experts' opinions that defendant was legally insane because he believed that his actions were morally justified.

Dr. Sharma felt he had an advantage over the other psychiatrists testifying for the defense in making his determination as to defendant's sanity, in that he had interviewed defendant within a year of the shootings, before defendant's statements had a chance to be clouded by faded memories or second thoughts.

According to Dr. Sharma, defendant's writings and his statements during negotiations and to the police afterward showed that he realized his actions were considered wrong by society and he would be arrested for them. Additionally, Dr. Sharma believed defendant's primary motivation in the shootings was revenge. In Dr. Sharma's opinion, if defendant acted out of revenge for past events, there was no direct connection between his mental illness and his acts, and he is not legally insane.

## CONTENTIONS

Defendant contends he established by a preponderance of the evidence that he was insane on February 8, 1993, and the trial court committed reversible error when it instructed the jury as to the definition of insanity. We conclude there is merit to defendant's claim of instructional error and do not reach his contention that he was entitled to a finding of insanity as a matter of law.

Defendant further contends he was denied the effective assistance of counsel at his sanity hearing by his attorney's failure to bring out evidence of statements he made at his first trial to the effect that he believed his actions constituted self-defense. Inasmuch as the jury's finding of sanity must be reversed due to instructional error, we need not address this contention.

Defendant also contends the trial court erred in imposing a greater sentence after his retrial. We agree.

## DISCUSSION

*Sanity*

The trial court instructed the jury pursuant to CALJIC No. 4.00: "A person is legally insane when by reason of mental disease or mental defect he was incapable of either: [¶] 1. Knowing the nature and quality of his act; or [¶] 2. Understanding the nature and quality of his act; or [¶] 3. Distinguishing right from wrong at the time of the commission of the crime. [¶] The defendant has the burden of proving his legal insanity at the time of the commission of the crime by a preponderance of the evidence." The trial court modified the instruction by adding the following: "*The term 'wrong' refers to both legal wrong and moral wrong. The concept of moral wrong refers to society's generally accepted standards, and not to the subjective standards of the defendant.*" (Italics added.) It is this addition to the instruction that defendant challenges.

■ As modified, the instruction thus required defendant to meet the burden of proving he was incapable of distinguishing right from both legal and moral wrong at the time he committed the crimes. This was error.

■ The trial court's focus on moral wrong was understandable in light of case law on the matter. In *People v. Rittger* (1960) 54 Cal.2d 720 [7 Cal.Rptr. 901, 355 P.2d 645], a defendant involved in a prison murder sought to justify his actions by his own "personal, prison-influenced standards," which fell outside the laws of self-defense. (*Id.* at p. 734.) In rejecting this attempt, the Supreme Court observed: "The fact that a defendant claims and believes that his acts are justifiable according to his own distorted standards does not compel a finding of legal insanity. [Citation.] This is necessarily so if organized society is to formulate standards of conduct and responsibility deemed essential to its preservation or welfare, and to require compliance, within tolerances, with those standards." (*Ibid.*)

In discussing legal insanity in general, the *Rittger* court looked back at the history of the insanity defense: "Also pertinent here are the following question of the Lords and answer of the judges in [M'Naghten's] Case ([(1843)] 10 Clark & Fin. [200, 211,] 8 Eng. Rep. [718, 722]): ' "If a person under an insane delusion as to existing facts, commits an offence in consequence thereof, is he thereby excused?" To which question the answer must of course depend on the nature of the delusion: but, making the . . . assumption . . . that he labours under . . . partial delusion only, and is not in other respects insane, we think he must be considered in the same situation as to responsibility as if the facts with respect to which the delusion exists were real. For example, if under the influence of his delusion he supposes another man to be in the act of attempting to take away his life, and he kills that man, as he supposes, in self-defence, he would be exempt from punishment. If his delusion was that the deceased had inflicted a serious injury to his character and fortune, and he killed him in revenge for such supposed injury, he would be liable to punishment.' [Citations.]" (*People v. Rittger, supra,* 54 Cal.2d at pp. 731–732; see also *People v. Skinner* (1985) 39 Cal.3d 765, 781, fn. 13 [217 Cal.Rptr. 685, 704 P.2d 752] [language from *M'Naghten's Case, supra,* 8 Eng. Rep. at p. 723, also quoted with approval].)

■ Being able to distinguish legal right from legal wrong is not the test for insanity, however. In *People v. Stress* (1988) 205 Cal.App.3d 1259 [252 Cal.Rptr. 913], the defendant killed his wife in order to get a forum to denounce what he believed was a conspiracy to draft his son. He was found sane in a court trial. The Court of Appeal reversed, noting that "[i]t appear[ed] the trial court believed that in the context of [Penal Code] section 25, subdivision (b) [defining insanity defense], the term 'wrong' meant legal and not moral wrong." (*Stress, supra,* at p. 1273.) Rather, "the proper question is whether a defendant can distinguish, not the legal rightness or wrongness of his act, but its moral rightness or wrongness." (*Id.* at p. 1272.)

■ The Supreme Court explained the difference between legal wrong and moral wrong in *People v. Coddington* (2000) 23 Cal.4th 529 [97 Cal.Rptr.2d

528, 2 P.3d 1081].[5] In *Coddington*, the court approved the following instruction, based on Penal Code section 25, subdivision (b), and *People v. Skinner*, *supra*, 39 Cal.3d 765: " 'Mental illness and mental abnormality, in whatever form either may appear, are not necessarily the same as legal insanity. A person may be mentally ill or mentally abnormal and yet not be legally insane. [¶] A person is legally insane when, by reason of mental disease or mental defect he was incapable of knowing or understanding the nature and quality of his act or incapable of distinguishing right from wrong at the time of the commission of the offense. The word "wrong" as used in this instruction is not limited to legal wrong, but properly encompasses moral wrong as well. Thus, the defendant who is incapable of distinguishing what is morally right from what is morally wrong is insane, even though he may understand the act is unlawful.' " (*Coddington*, *supra*, at p. 608.)

CALJIC No. 4.00 itself makes no reference to "legal" or "moral" right or wrong. It simply states that "[a] person is legally insane when by reason of mental disease or mental defect he was incapable of . . . [d]istinguishing right from wrong . . . ."

Here, the effect of the trial court's instruction required defendant to prove that he could not distinguish legal right from legal wrong, *in addition to* moral right from moral wrong. That defendant was prejudiced by this instruction is established by Dr. Sharma's testimony that defendant's writings and his statement during negotiations and to the police afterward showed that he realized his actions were considered wrong by society and he would be arrested for them. In other words, because defendant knew that he was committing a legal wrong, he was sane regardless of his inability to distinguish moral right from moral wrong. This is not the law. (*People v. Coddington*, *supra*, 23 Cal.4th at p. 608.)

■  Defendant offered evidence that he was suffering under the delusion that doctors were injecting him and others with lethal materials and that he felt morally justified in killing doctors to protect himself and others. A jury could accept this evidence as establishing that defendant could not distinguish between moral right and moral wrong. As stated in *M'Naghten's Case*, " '[I]f under the influence of his delusion he supposes another man to be in the act of attempting to take away his life, and he kills that man, as he supposes, in self-defence, he would be exempt from punishment.' " (*People v. Rittger*, *supra*, 54 Cal.2d at p. 732.) Defendant had the right to have the jury make the determination whether he fell within that rubric, but the erroneous instruction denied him of that right. Accordingly, he is entitled to reversal of the finding of sanity. (See *People v. Baker* (1954) 42 Cal.2d 550, 576–577 [268 P.2d

---

[5] Overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, footnote 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].

705]; *People v. Duckett* (1984) 162 Cal.App.3d 1115, 1127 [209 Cal.Rptr. 96].)

*Sentence*

Defendant originally was sentenced to two consecutive terms of life imprisonment with the possibility of parole, with a consecutive determinate term of 12 years.[6] Following his retrial, the trial court sentenced him to three consecutive terms of life imprisonment with the possibility of parole, plus a consecutive determinate term of 25 years eight months.[7]

If a defendant successfully challenges his conviction and obtains a new trial, the due process and double jeopardy clauses of the California Constitution prohibit the imposition of a greater sentence following retrial. (*People v. Henderson* (1963) 60 Cal.2d 482, 497 [35 Cal.Rptr. 77, 386 P.2d 677]; *People v. Thompson* (1998) 61 Cal.App.4th 1269, 1275 [71 Cal.Rptr.2d 586].) The People agree that defendant should not have received a longer sentence following his retrial than he received originally. His sentence therefore cannot exceed that which he received originally—a determinate term of 12 years plus two consecutive terms of life imprisonment with the possibility of parole.

Defendant also complains of the notation on the abstract of judgment: "Pursuant to [Penal Code] section 2933.5A(2)(O), the court is prohibited from granting custody credits as to counts 1, 2, and 3 [attempted murder]." The People agree with defendant that Penal Code section 2933.5, subdivision (a)(2)(O), is inapplicable here.

Penal Code section 2933.5, subdivision (a)(2)(O), prohibits an award of conduct credits to a defendant convicted of "[a]ny felony in which the defendant personally inflicted great bodily injury, as provided in Section 12022.53 or 12022.7." It applies, however, only to a defendant "who previously has been convicted two or more times, on charges separately brought and tried, and who previously has served two or more separate prior prison terms." (Pen. Code, § 2933.5, subd. (a)(1).) Inasmuch as defendant has

---

[6] One life term was imposed concurrently. Three years were imposed for great bodily injury caused by one of the attempted murders; five years were imposed for one count of false imprisonment, the other false imprisonment term to run concurrently; and four years were imposed for the use of a firearm in the commission of the false imprisonment.

[7] The trial court imposed 11 years for firearm use and great bodily injury enhancements on the attempted murder counts, eight years for one false imprisonment count and a one-third consecutive term of one year and eight months for the other false imprisonment count, plus five years for firearm use on the false imprisonment.

no prior convictions, this provision is not applicable to him. Hence, it must be deleted from the abstract of judgment.

The judgment of conviction is affirmed. The judgment in the sanity phase is reversed and the matter is remanded for a new sanity hearing. If defendant is found to have been sane at the time of the commission of the offenses, he should be resentenced. On resentencing, the aggregate term to be imposed cannot exceed 12 years plus two consecutive terms of life imprisonment with the possibility of parole, and the abstract of judgment should not contain the notation that Penal Code section 2933.5, subdivision (a)(2)(O), is applicable to the case.

Vogel, J., and Mallano, J., concurred.

A petition for a rehearing was denied April 22, 2005.