[No. D005997. Fourth Dist., Div. One. Nov. 15, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
STANLEY STRESS, Defendant and Appellant.

COUNSEL

Stephen J. Perrello, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Rudolph Corona, Jr., and Maxine P. Cutler, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BENKE, J.—Following a court trial, appellant Stanley Stress was found guilty of murder in the first degree. It was further determined he was sane

during the commission of the crime. Sentenced to a term of 25 years to life, he appeals.

Appellant argues the trial court erred in finding an intention to kill was alone sufficient to establish the malice element of murder. He contends a finding must further be made the killing was done with a wanton disregard for human life or with an antisocial motivation. Appellant also argues the trial court erred in failing to consider appellant's mental illness in deciding whether the murder was deliberate and premeditated. Finally, he contends the trial court erred in holding that the capacity to distinguish right from wrong, an element of the definition of insanity contained in Penal Code[1] section 25, subdivision (b), means the capacity to appreciate that an act is a violation of law. Rather, appellant argues the definition requires the capacity to appreciate that the act is morally wrong. We reject the contentions involving the verdict of first degree murder but find merit in appellant's argument with regard to the finding of sanity and reverse for a new sanity hearing.

I

FACTS

On the morning of November 4, 1985, appellant called the 911 emergency number and stated he had hit his wife with an ax and believed he had killed her. He requested the police be sent. Appellant provided his address and telephone number. Responding officers discovered the body of appellant's wife on a sofa bed with an ax embedded deep in her head. The cause of death was later determined to be transection of the brain stem due to the ax wound. Appellant was placed under arrest and transported to the police station.

After waiving his rights, appellant was questioned. When asked what had happened that morning, appellant related a sometimes coherent, sometimes incoherent story which began in 1969 when his son was a football player at the University of California at Berkeley. It appeared his son would not be drafted by a professional football team. Not wishing to be drafted into the armed forces for service in Vietnam, appellant's son told him he would go to Canada unless he could get a conscientious objector deferment. Appellant helped his son obtain the deferment.

Appellant's involvement in his son's draft difficulties led him to conclude a conspiracy existed between the professional athletic leagues, the television

---

[1] All statutory references are to the Penal Code unless otherwise specified.

networks, the federal government and others to insure that professional athletes were not drafted for service in the war. He believed that in many cases this end was accomplished by placing the athletes in National Guard units. Making the public aware of this conspiracy became a crusade. Appellant wrote what he estimated was more than a quarter million letters. (It was appellant's usual practice to write a letter to President Reagan and then send 500 copies of that letter all over the United States.) He wore a sandwich board bearing his message and even engaged in a 62-day hunger strike.

The crusade, however, was not going well and appellant believed this was because the Copley Press and other news agencies were involved in the conspiracy and cover-up. Appellant reached this conclusion because at the time of the Vietnam War, Mrs. Copley owned part of the San Diego Charger football team and CBS owned the New York Yankees. Appellant also believed President Reagan was involved since at the time of the Vietnam War, Reagan, as Governor of California, was the commander of the California National Guard.

At the time he killed his wife, appellant had been under a federal indictment for two years, charged with writing threatening letters to the President of the United States. He was scheduled for a hearing on those charges before Judge Irving the day after the killing. Appellant was concerned his case would not come to trial since it appeared the judge wanted him to receive psychiatric treatment. He stated to the interrogating officers, "[O]bviously as a last resort I killed my wife to have a day in court."

Appellant explained that about three months before the killing he began to think some drastic action was necessary to bring his cause before the public and to provide him with a platform for the presentation of his message. Appellant decided it would be necessary to kill either himself or his wife. He explained the decision to kill his wife instead of himself by stating, "So if I injured myself there would be no one to tell my story. If I injured her, unfortunately—the lesser of two evils, I guess."

On the morning of the killing, appellant decided the only way he was going to get a trial was to do something that would "force their hand." Appellant told the officers "She was the most vulnerable and she's 74, takes about 21 pills a day, can't drive, partially deaf, partially blind; and she's falling alot [sic] now—she fell on the front step last week." Appellant stated to the officers "I had breakfast, during breakfast I thought, more bullshit tomorrow when I go to court, somewhere something's got to be done, somebody's got to die, somebody's got to be a martyr." Appellant, after apparently considering other weapons, went to the garage, took an ax, returned to where his wife was sleeping and hit her once in the head.

The trial court was provided with a number of psychological reports to assist in evaluating appellant's state of mind at the time of the crime. The first of these was prepared in January 1984 by Dr. Rodgers for the federal court concerning whether appellant was competent to stand trial. The report dismisses any potential for violence in appellant's delusional perception of reality. The report notes appellant "Apparently, in an attempt to 'grab the attention of the White House,' . . . did make some statements in several of his letters which sounded as if they were threatening to the President." The report found no history of violent behavior or outbursts and found appellant free from hallucinations, delusions, ideas of reference or paranoid tendencies. The report concluded appellant suffered from no psychiatric disorder, was not in need of formal psychiatric care, was competent to stand trial and would make no further threats to the President.

A second report, prepared by Dr. Solomon for the federal court in January 1985, concluded appellant was a pleasant and highly intelligent man who was not suffering from a mental disease or defect to the extent he was incompetent to stand trial. However, in April 1985, Dr. Solomon reviewed appellant's delusional scheme and his then existing state of mind. He concluded that while appellant was basically a decent and honorable man, he was also "obsessively deluded in a classical paranoid manner, his crusade pervading his entire life and personality and making him unable to conduct himself in a law-abiding manner." Dr. Solomon's report concluded appellant was incompetent to stand trial but not a danger to himself or others. The report recommended psychiatric treatment in an institutional setting.

After appellant was charged with the murder of his wife, proceedings were conducted pursuant to section 1368 to determine whether appellant was competent to stand trial. As part of that process, a series of psychological evaluations were done. Dr. Hansen reviewed appellant's background and the development of his delusional scheme. The doctor stated appellant's beliefs concerning conspiracies between the professional sports leagues, the government and others first developed into what is called "an over valued idea." Over time these overvalued ideas became "frankly paranoid delusions." Dr. Hansen diagnosed appellant as suffering from paranoia and concluded he was incompetent to stand trial.

Dr. DiFrancesa also evaluated appellant, found him suffering from paranoia and also concluded he was incompetent to stand trial.

Appellant was found incompetent to stand trial and was committed to Patton State Hospital. In March 1986 appellant was returned to court and a series of psychological reports were again prepared concerning his present competence. Some of those reports contained information pertinent to

appellant's state of mind at the time of the crime. In his report Dr. Abrams noted he asked appellant why he had killed his wife. Appellant stated: "I think that guy Klinghoffer was sacrificed for international politics. They got a lot of publicity. I was following it pretty closely. I was under the pressure of the court for two years. It was one way to get things done. It made her a sacrifice as a soldier. I thought of the government of the U.S.A. as a personal enemy of mine." The doctor found appellant extremely self-centered in a grandiose, paranoid manner. The doctor concluded that only appellant's needs and preoccupations were of any interest to him. Appellant saw himself involved in a grand cause that took precedence over anyone else's wants or needs.

In March 1986 psychiatrist Dr. Haig Koshkarian filed a report commenting both on appellant's competence to stand trial and on appellant's state of mind at the time of the killing. The doctor found appellant very disturbed and psychotic. Appellant related to the doctor the killing of his wife was in part a mercy killing and in part a sacrificial killing. His wife had been in failing health and had told appellant she no longer wished to suffer. Appellant was at his wits end concerning how to deal with the conspiracy he faced and thus decided to kill his wife in order to gain the forum he believed necessary to both present his story to the public and to save future generations from being killed in unjust wars. Appellant believed he was at war with the government and that the rules of war applied. While appellant knew killing his wife was against the law, he believed anything he did to expose the conspiracy was justified. Appellant stated his wife died as a soldier and he would be punished as a soldier. He knew he would face charges of murder but believed no jury would convict him if they knew what the government had conspired to do to him and the country.

Dr. Koshkarian concluded appellant was a paranoid and psychotic man whose life was being more and more taken over by his delusional beliefs. The doctor stated: "[T]he killing of his wife was not the callous act of a self-centered political zealot and malcontent willing to selfishly put his interests, causes, and notoriety above the life of his wife. Rather, it was the act of a frantic man who saw the sacrifice of his wife and himself as a last and final attempt to get his story at the public, a story which he saw as necessary to save the lives of untold future generations. In his view at the time, his act was necessary and right and would have been similarly seen so by the public at large if they knew the terrible secret truths that he knew."

The doctor concluded that at the time of the crime appellant knew the nature and quality of his acts, but due to mental disease he did not know the wrongfulness of his behavior.

In November 1986 psychiatrist Dr. Wait Griswold filed a report concerning appellant's competence to stand trial and his mental condition at the time of the crime. After extensively reviewing appellant's history and the reports of other clinicians, Dr. Griswold concluded appellant suffered from a paranoid disorder with a permanent and unshakable delusion system accompanied by a preservation of clear and orderly thinking. Dr. Griswold concluded appellant was sane at the time of the crime since he was not, because of a mental disease or defect, incapable of knowing or understanding the nature and quality of his act or of distinguishing right from wrong. The doctor noted that a clear motivation for appellant's act was to get himself arrested and thus provide a forum for the presentation of his paranoid ideas. The doctor concluded this demonstrated appellant knew right from wrong.

Another evaluation of appellant was done in November 1986 by psychiatrist Dr. Michael Jaffe. Again reviewing appellant's history and other reports concerning appellant and following an interview, Dr. Jaffe concluded appellant was suffering from a longstanding paranoid delusional system of a psychotic nature. In summing up his conclusions about appellant, the doctor stated: "He is self-centered enough and lacking in true empathy to consider only his wishes, his causes, and thoughts above that of any other. In this light he saw his cause to expose the government as overriding any personal wants. He was willing to sacrifice for his crusade. Mr. Stress seems to look upon events and circumstances that tend to stand in his way of his crusade not in terms of right and wrong but in terms instead of good and evil. His action in killing his wife has a quality of a grotesque martyrdom to it. The cause overriding the means to obtain it as during the Christian Crusades crimes were committed in the good name of Christ. At the time of the commission of the offense, wrongfulness was not a concept in his mind but he knew that the government was 'evil' and he felt justified that he was after a 'good' cause. Any means to obtain the good cause was therefore acceptable."

Dr. Jaffe concluded that while appellant knew the nature and quality of his act, he was unable to distinguish between right and wrong and thus was insane at the time of the crime.

Dr. Solomon, who had first seen appellant in 1985, wrote a short report in November 1986 commenting on appellant's state of mind at the time of the crime. The doctor concluded appellant was growing increasingly frustrated. He felt everyone was against him, even his wife. As appellant approached another court hearing, his rage mounted. "The tension became unbearable and burst into uncontrollable frenzy. He no longer understood the nature and quality of his acts or knew right from wrong. Like Jehova

with a thunderbolt he struck the only 'enemy' in reach, his wife." The doctor concluded in Stress's psychotic way, he knew what he was doing but his actions were mechanical and pathological. He really did not want or intend to kill his wife but was temporally out of control, he was irrational and medically irresponsible.

## II

## DISCUSSION

### A. *Finding of Malice*

██ Appellant argues the trial court erred in finding the element of malice necessary for a conviction of murder. He contends the trial court found express malice and defined that concept as the intent to kill. While appellant concedes intent to kill is part of the definition of express malice, he argues express malice also requires the defendant act in wanton disregard for human life or from antisocial motivation. He contends the trial court did not appreciate the motivational aspect of express malice, and since the evidence indicates the killing was not done in wanton disregard for human life or from an antisocial motivation, the case should be remanded to allow the court to reconsider its finding of malice. We conclude the trial court properly applied the law and that sufficient evidence exists to support the finding of malice.

We begin with the proposition that murder is the unlawful killing of a human being with malice aforethought. (§ 187.[2]) Malice is express when there is manifest a deliberate intention to unlawfully kill and implied when no considerable justification appears or when the circumstances attending the killing show an abandoned and malignant heart. When it is shown that the killing resulted from the intentional doing of an act with express or implied malice as defined in the section, no other mental state need be shown to establish malice aforethought. (§ 188;[3] cf., *People* v. *Croy* (1985) 41 Cal.3d 1, 18, fn. 12 [221 Cal.Rptr. 592, 710 P.2d 392].)

---

[2] Penal Code section 187 provides in part: "(a) Murder is the unlawful killing of a human being . . . with malice aforethought."

[3] Section 188 provides: "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.

"When it is shown that the killing resulted from the intentional doing of an act with express or implied malice as defined above, no other mental state need be shown to establish the mental state of malice aforethought. Neither an awareness of the obligation to act within the general body of laws regulating society nor acting despite such awareness is included within the definition of malice."

While the inherently vague nature of implied malice may leave room for controversy over the state of mind necessary for its finding, express malice is not so ethereal. The clear words of section 188 provide that once the trier of fact finds a deliberate intent to unlawfully kill, no other mental state need be shown. Thus, the trial court was not required to find appellant acted with a wanton disregard for human life or with some antisocial motivation.

In finding malice aforethought, the court noted there was strong evidence appellant intended to kill his wife. The court reviewed appellant's mental state and found that while appellant's motive for the killing was bizarre and delusional, he clearly intended to kill without lawful justification. Its ruling was correct.

Appellant's avowed goal was to commit an act of such importance and visibility the courts and the public would be forced to listen to his theories of conspiracy. The plan he designed to accomplish that goal was to kill his wife. There was no justification, excuse or mitigation for the killing offered by appellant that is recognized by the law. The evidence shows an intent unlawfully to kill. The trial court correctly found appellant harbored malice aforethought.

B. *Finding of Premeditation and Deliberation*

Appellant argues the trial court misunderstood the mental elements necessary for a finding of first degree murder. Appellant notes that in 1981 the Legislature amended the definition of first degree murder contained in section 189 by adding a paragraph, stating: "To prove the killing was 'deliberate and premeditated,' it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act." (Stats. 1981, ch. 404, § 7, p. 1593.) The trial court noted this change in discussing its finding of premeditation and deliberation. It again concluded that while the motivation for the act was "crazy," the premeditative and deliberative requirements of first degree murder were present. The court further concluded that the only way such a finding could be negated in this case was if the law required a finding of mature and meaningful reflection upon the gravity of the act.

Appellant concedes the amendment to section 189 but argues that whatever the phrase "maturely and meaningfully reflect upon the gravity of his or her act" may mean, a finding of deliberation and premeditation still requires evidence the decision to act was the result of careful thought and a weighing of considerations, that premeditation and deliberation are measured by the extent of reflection applied and that a defendant cannot be said to have premeditated and deliberated unless he has made a decision and a

choice to kill having in mind the consequences of his action. Appellant contends when the trial court stated the only way premeditation and deliberation could be negated in this case was if the concept of mature and meaningful reflection were still elements of the crime, it took too restrictive a view of the state of mind required and failed to correctly relate appellant's psychotic and delusional state to a finding of first degree murder. We believe the trial court properly applied the law.

In *People* v. *Van Ronk* (1985) 171 Cal.App.3d 818, 822-823 [217 Cal.Rptr. 581], this court reviewed the legal concept of premeditation and deliberation. "Premeditation and deliberation are not to be confused with a deliberate intent to kill. Premeditation and deliberation require 'substantially more reflection; i.e., more understanding and comprehension of the character of the act than the mere amount of thought necessary to form the intent to kill.' (*People* v. *Wolff* (1964) 61 Cal.2d 795, 822 . . . .) It is therefore 'obvious that the mere intent to kill is not the equivalent of a deliberate and premeditated intent to kill.' (*People* v. *Bender* (1945) 27 Cal.2d 164, 181 . . . .) Consequently, an intentional killing is not first degree murder unless the intent to kill was formed upon a preexisting reflection and was the subject of actual deliberation and forethought. (*People* v. *Rowland* (1982) 134 Cal.App.3d 1, 7-9 [184 Cal.Rptr. 346].)"

In *People* v. *Martinez* (1987) 193 Cal.App.3d 364, 369 [238 Cal.Rptr. 265], the concept of deliberation and premeditation was explained as follows: "A verdict of murder in the first degree based on a theory of a willful, deliberate and premeditated killing is proper only if the defendant killed 'as a result of careful thought and weighing of considerations; as a *deliberate* judgment or plan; carried on coolly and steadily, [especially] according to a preconceived design; . . .' (*People* v. *Bender* (1945) 27 Cal.2d 164, 183 . . .; *People* v. *Caldwell* (1955) 43 Cal.2d 864, 869 . . . ; *People* v. *Velasquez* (1980) 26 Cal.3d 425, 435 . . . ."

In *People* v. *Wolff* (1964) 61 Cal.2d 795, 821 [40 Cal.Rptr. 271, 394 P.2d 959], as part of the then developing concept of diminished capacity, the Supreme Court held the test for premeditation and deliberation included consideration of the extent to which a defendant could "*maturely and meaningfully reflect* upon the gravity of his contemplated act." (See also *People* v. *Cruz* (1980) 26 Cal.3d 233, 242-251 [162 Cal.Rptr. 1, 605 P.2d 830].) This element of premeditation and deliberation looked not to the evidence of planning or preconceived design, but rather to the general mental condition of the accused. Thus, diminished capacity could be found, and the offense reduced to second degree murder, even though the killing was the result of lengthy and complex planning if, in the words of *Wolff,* "the extent of [the defendant's] understanding, reflection upon it and its

consequences, with realization of the enormity of the evil, appears to have been materially—as relevant to appraising the quantum of his moral turpitude and depravity—vague and detached." (*People* v. *Wolff, supra,* 61 Cal.2d at p. 822.)

Perhaps in part because of a concern that such formulations are so vague as to escape understanding, so complex as to prevent workable application, and so ambiguous as to allow for capricious results, the Legislature in 1981 eliminated the judicially created defense of diminished capacity. (Stats. 1981, ch. 404, § 7, p. 1593.) The next year the People through Proposition 8 also eliminated the defense. [See § 25.])

As a part of the legislation eliminating the defense of diminished capacity, a paragraph was added to section 189 specifically stating that it was unnecessary to prove a defendant maturely and meaningfully reflected on the gravity of his or her act in proving deliberation and premeditation. (Stats. 1981, ch. 404, § 7, p. 1593.) Mature and meaningful reflection was clearly the California Supreme Court's shorthand way of applying the concept of diminished capacity to the elements of deliberation and premeditation. Essentially the court broadened the elements of premeditation and deliberation by requiring not merely a weighing of considerations and careful thought but by requiring a quality of deliberation and weighing which the court described as mature and meaningful reflection. This broadening of the elements had the practical effect of allowing a defense based on the claim that even though a defendant had carefully planned, and had considered the consequences of an act, he nonetheless was not guilty of first degree murder when, because of mental disease or defect, his reflection was not mature and meaningful. Thus, the phrase mature and meaningful reflection defined the capacity which the defendant could claim was diminished.

The effect then of the removal of mature and meaningful reflection as part of the elements of deliberation and premeditation is to narrow those elements. ■ We conclude that with the removal of the vague requirement for mature and meaningful reflection, deliberation and premeditation are proved when the trier of facts concludes not merely that the defendant harbored an intent to kill but when that intent was the result of forethought and reflection, and when careful thought and a weighing of considerations are demonstrated. A finding of deliberation and premeditation is not negated by evidence a defendant's mental condition was abnormal or his perception of reality delusional unless those conditions resulted in the failure to plan or weigh considerations for and against the proposed course of action. The mental process necessary for a finding of deliberation and premeditation is not dependent on the motivation for the act. Nor is the necessary

mental process lacking when the considerations reflected on by the defendant were the product of mental disease or defect.

Appellant would decry this conclusion, believing it fails to properly relate intuitive moral conclusions concerning the culpability of the mentally ill to determinations of criminality. It is undoubtedly true that the demise of the defense of diminished capacity and the narrowing of mental elements will reduce the class of offenders whose criminal acts will be excused or mitigated because of mental disease or defect. However, whether this is wise or will make for a more workable criminal justice system must be left to public rather than judicial debate.

The evidence appellant killed his wife after careful reflection and after a weighing of considerations is strong. The trial court properly chose not to consider whether appellant maturely and meaningfully reflected on the gravity of his act. Appellant was properly convicted of first degree murder.

## C. *Finding of Sanity*

Appellant argues the trial court applied the wrong test in finding appellant sane at the time of the crime. Appellant contends that while the court used that version of the *M'Naghten* test (see *People v. Drew* (1978) 22 Cal.3d 333, 339-348 [149 Cal.Rptr. 275, 583 P.2d 1318]) of insanity contained in section 25, subdivision (b),[4] it made a fundamental, and in this case prejudicial, error in the application of one part of the test.

Appellant, citing section 25, subdivision (b), and *People v. Skinner* (1985) 39 Cal.3d 765 [217 Cal.Rptr. 685, 704 P.2d 752], notes that in order to be found insane, the trier of fact must conclude the defendant was incapable, at the time of the crime, of knowing and understanding the nature and quality of his act or incapable of distinguishing right from wrong. (The incapacity must be based on a mental disease or defect even though that requirement is not specifically mentioned in 25, subd. (b). [*People v. McCaslin* (1986) 178 Cal.App.3d 1, 8 (223 Cal.Rptr. 587).])

Appellant asserts that in dealing with the question of appellant's capacity to distinguish right from wrong, the trial court believed the ques-

---

[4]Section 25, subdivision (b), provides: "In any criminal proceeding, including any juvenile court proceeding, in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense."

tion involved appellant's capacity to understand that his act was criminal. Appellant argues the proper question is whether a defendant can distinguish, not the legal rightness or wrongness of his act, but its moral rightness or wrongness. (For a general discussion of the question, see LaFave & Scott, Substantive Criminal Law, § 4.2, pp. 442-444; Goldstein, The Insanity Defense (1967) pp. 51-53; see also Note, *Returning to M'Naghten to Avoid Moral Mistakes: One Step Forward, or Two Steps Backward for the Insanity Defense* (hereafter *Returning to M'Naghten*) (1988) 30 Ariz. L.Rev. 135, 146-153.) Appellant argues that given the evidence in the case, it is reasonably probable had the trial court applied the right test it would have found appellant insane. We agree and remand the case for a new hearing on the issue of sanity.

What section 25, subdivision (b), means by right and wrong was in part clarified in *People* v. *Skinner, supra,* 39 Cal.3d at pages 777-784. The court there rejected the argument that the wrong which the defendant must comprehend is a legal rather than a moral wrong. The court reviewed prior California Supreme Court cases and other sources and concluded no such restrictive definition had ever been given to the concept. The court stated: "The rule that a defendant must know what he is doing is 'wrong and criminal' has been recognized as the accepted formulation 'since the first decision in this state (*People* v. *McDonell,* 47 Cal. 134) and has been followed consistently. . . .' (*People* v. *Daughterty* (1953) 40 Cal.2d 876, 893-894 . . . , noting that the rule had been approved again in *People* v. *Wells, supra,* 33 Cal.2d 330, 349-350 . . . .) Affirming the judgment in *People* v. *Rittger* (1960) 54 Cal.2d 720, 734 . . . , we applied this test and concluded that the expert testimony could be understood as meaning that the defendant did recognize that 'his conduct did not accord with social standards of right and legal standards of justification.' (See also *People* v. *Sloper* (1926) 198 Cal. 238, 248 . . . ; *People* v. *Koehn, supra,* 207 Cal. 605, 612 [279 P. 646]; *People* v. *Reid, supra,* 193 Cal. 491, 496 [225 P. 859]; *People* v. *Bundy, supra,* 168 Cal. 777, 779 [145 P. 537].)" (*People* v. *Skinner, supra,* 39 Cal.3d at pp. 780-781; see *People* v. *Leever* (1985) 173 Cal.App.3d 853, 870 [219 Cal.Rptr. 581]; see also Note, *Returning to M'Naghten, supra,* 30 Ariz. L.Rev. at pp. 146-147.)

 It is clear that in California "wrong," as the term is used in section 25, subdivision (d), refers both to legal wrong and moral wrong. It is therefore necessary to determine whether the trial court properly applied the dual meaning of the term.

 During appellant's argument in the sanity phase, the trial court asked counsel if "wrong" meant criminally wrong or morally wrong. Defense counsel replied it meant morally wrong. The prosecutor gave a

lengthy reply which at times seemed to conclude wrong meant criminally wrong and at times appeared to concede wrong meant morally wrong. The prosecutor clearly argued appellant was not among that class of offenders who were deemed insane, even though they knew their acts to be criminal, because God had directed them to act.

The trial court concluded appellant suffered from a chronic mental disorder and was delusional at the time of the crime. It noted that Drs. Koshkarian and Jaffe agreed appellant was aware his act was criminal. Indeed, its very criminality was central to the motive for the act. The court appears to have determined that the doctors' finding of insanity was based on their conclusion appellant did not believe his act was morally wrong because it was carried out for a greater good. Thus, in their minds appellant was unable to distinguish between what was morally right and what was morally wrong.

The court stated if it were to apply the American Law Institute test of insanity, it would find appellant insane because he lacked the substantial capacity to conform his conduct to the requirements of the law.[5] Under the test defined by section 25, subdivision (b), however, appellant was sane.

Following its conclusion that appellant was aware of the nature and quality of his act, the court stated: "That gets us to the second prong, and I think there's a legal issue here of what does the term 'wrongfulness' mean. If the term 'wrongfulness' means moral correctness, social benefit, that would be one thing. I think the law is clear that the term 'wrongfulness' means violation of the laws of the state . . . ." The court continued: "There are acts that people thought were moral that, however, violated the laws. And the purpose of the insanity defense, I think, is not to allow moral judgments or differing moral values to be the standard of insanity. The question, I think, is a narrow question: Does the defendant know and understand that the act is wrong?" The court concluded appellant understood his act was criminal and found him sane at the time of the crime.

It appears the trial court believed that in the context of section 25, subdivision (b), the term "wrong" meant legal and not moral wrong. While there is much good sense in the trial court's position, and while that rule is followed in some jurisdictions (see, e.g., *State* v. *Crenshaw* (1983) 98 Wn.2d 789 [659 P.2d 488, 489]; *State* v. *Hamann* (Iowa 1979) 285 N.W.2d 180,

---

[5] " 'A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.' " (*People* v. *Drew, supra,* 22 Cal.3d 333, 345, quoting A.L.I.'s Model Penal Code, section 4.01, fn. omitted.)

182-184; *State* v. *Boan* (1984) 235 Kan. 800 [686 P.2d 160],—see also Note, *Returning to M'Naghten, supra,* Ariz. L.Rev. at pp. 146-147; Goldstein, The Insanity Defense, *supra,* at pp. 51-53; LaFave & Scott, Substantive Criminal Law, *supra,* § 4.2, pp. 442-444; A.L.I., Model Pen. Code, § 4.01 and com., pp. 163-186), it is not the position enunciated by *Skinner.* The trial court, therefore, erred in concluding that "wrong" in the sanity context means criminal rather than moral wrong.

In order to address the question of prejudice arising from the trial court's error, it is necessary we further define the concept of moral wrong as it applies to determinations of sanity in order to determine whether a result more favorable to appellant would have been reached had the trial court applied the proper standard. (*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].)

 Although seldom addressed by the courts, which have generally left the word "wrong" undefined in jury instructions, the question is whether moral wrong is to be judged by society's generally accepted standards of moral obligation or whether the subjective moral precepts of the accused are to be employed. While the inherent "slipperiness" of the terminology in this area may leave some doubt, it appears most courts mean that the defendant is sane if he knows his act violates generally accepted standards of moral obligation whatever his own moral evaluation may be. (Compare, *State* v. *Skaggs* (1978) 120 Ariz. 467 [586 P.2d 1279, 1284]; *State* v. *Corley* (1972) 108 Ariz. 240 [495 P.2d 470, 472-473]; *Com.* v. *Banks* (1987) 513 Pa. 318 [521 A.2d 1, 14]; *Chase* v. *United States* (7th Cir. 1972) 468 F.2d 141, 148; *State* v. *Hamann, supra,* 285 N.W.2d at pp. 182-184; *United States* v. *Segna* (9th Cir. 1977) 555 F.2d 226, 232-233; see also LaFave & Scott, Substantive Criminal Law, *supra,* at pp. 442-444; Goldstein, The Insanity Defense, *supra,* at pp. 51-53; Note, *Returning to M'Naghten, supra,* 30 Ariz. L.Rev. at pp. 147-148.)

Again, while not entirely clear, it appears California follows the rule that moral obligation in the context of the insanity defense means generally accepted moral standards and not those standards peculiar to the accused. In *Skinner* the court cites with approval an opinion by Justice Cardozo which states: " 'Knowledge that an act is forbidden by law will in most cases permit the inference of knowledge that, according to the accepted standards of mankind, it is also condemned as an offense against good morals. . . .' (*People* v. *Schmidt* (1915) 216 N.Y. 324, 338-340 . . . ." (*People* v. *Skinner, supra,* 39 Cal.3d 765, 783-784, fn. omitted.) This quote seems to suggest that general moral standards and not personal ones are determinative. (See Note, *Returning to M'Naghten, supra,* Ariz. L.Rev. at p. 148.)

In *People* v. *Rittger* (1960) 54 Cal.2d 720, 734 [7 Cal.Rptr. 901, 355 P.2d 645], in the context of a claim that the evidence was insufficient to support a finding of legal sanity, the court stated: "Dr. Francis' testimony can reasonably be understood to mean that in his opinion defendant, although recognizing that his conduct did not accord with social standards of right and legal standards of justification, felt that [the victim] might attack him at some future time and therefore, according to defendant's personal, prison-influenced standards he was 'justified' in eliminating [the victim]. The fact a defendant claims and believes that his acts are justifiable according to his own distorted standards does not compel a finding of legal insanity. [Citation.] This is necessarily so if organized society is to formulate standards of conduct and responsibility deemed essential to its preservation or welfare, and to require compliance, within tolerances, with those standards."

We conclude in California "wrong," in the sanity context, means the violation of generally accepted standards of moral obligation. While we agree with the commentators that in most instances legal wrongfulness and moral wrongfulness are equivalent, this is not always the case (see Goldstein, The Insanity Defense, *supra,* § 4.2 at pp. 51-55; LaFave & Scott, Substantive Criminal Law, *supra,* at pp. 442-444) and a defendant is free to argue, in the terms of section 25, subdivision (b), that while he was able to distinguish between legal right and wrong he could not distinguish between moral right and wrong.

In finding the defendant sane, the trial court repeatedly commented appellant's motivations were "crazy" but that appellant, nonetheless, recognized his acts were illegal. As we have noted, the court stated that were the American Law Institute test still in effect, it might have found appellant unable to conform his conduct to the requirements of the law and would have found appellant insane. Appellant's explanation for killing his wife was liberally sprinkled with comments indicating her death would contribute to some higher good. He described his dealings with the government as a war and his wife as a soldier in that war. While the center of appellant's motivation was to be charged with a serious crime and thus be provided a forum to espouse his ideas, he at one time stated that if aware of the facts of his crusade, no jury would convict him. We believe these facts can be interpreted as a belief by appellant that while his act was illegal, it did not violate generally accepted moral standards. We believe, therefore, if the trial court had used the proper standard regarding knowledge of wrong contained in section 25, subdivision (b), it is reasonably probable a more favorable verdict for appellant would have been returned. (See *People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

The verdict of murder in the first degree is affirmed; the case is remanded for a new hearing on the issue of sanity.

Kremer, P. J., and Todd, J., concurred.

A petition for a rehearing was denied December 5, 1988, and respondent's petition for review by the Supreme Court was denied February 23, 1989.