Filed 1/12/15  P. v. Ruiz CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H039636 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. F1035769) |
| v. | |
| JEREMIAH GONZALEZ RUIZ, | |
| Defendant and Appellant. | |

## I.     INTRODUCTION

After a court trial, defendant Jeremiah Gonzalez Ruiz was convicted of two counts of second degree robbery (Pen. Code, §§ 211, 212.5, subd. (c))[1] and one count of carrying a concealed dirk or dagger (former § 12020, subd. (a)(4)[2]).  The trial court found true allegations that, in the commission of the robberies, defendant personally used a dangerous or deadly weapon.  (§ 12022, subd. (b)(1).)  Defendant subsequently admitted that he had five prior "strike" convictions (§§ 667, subds. (b)-(i), 1170.12) and two prior serious felony convictions (§ 667, subd. (a)), and that he had served one prior prison term for a violent felony (§ 667.5, subd. (a)) and three other prior prison terms (§ 667.5, subd. (b)).

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The crime of carrying a concealed dirk or dagger is now proscribed by section 21310.  (See Stats. 2004, ch. 247, §  7; Stats. 2010, ch. 711, § 6.)

Defendant then had a court trial on the issue of his sanity at the time of the offenses.  (See § 25, subd. (b).)  The trial court found that defendant was sane.  Defendant was sentenced to a prison term of 50 years to life consecutive to 31 years.

On appeal, defendant contends the trial court used an incorrect standard in determining whether he was sane at the time of the offenses.  Defendant also contends that California law prevented him from presenting a complete insanity defense.  We will affirm the judgment.

## II.     BACKGROUND

### A.     *The Robbery*

On September 28, 2010, Patricia Velasquez was working as the cashier at a Jack in the Box restaurant.  Defendant entered the restaurant and ordered two croissant sandwiches from Velasquez.  Velasquez rang up the sale, but defendant refused to pay her.  Velasquez went to help some other customers and then returned, again asking defendant to pay for the sandwiches.  Defendant said he was "a member of the Mafia" and that he would not pay.  Defendant appeared serious.

Velasquez went into the kitchen, where two female coworkers were cooking and doing prep work.  Defendant entered the kitchen through a door in the dining area.  Defendant slapped Velasquez in the face with his hand, causing her head to hit a microwave oven.  Defendant's other hand appeared to be holding something in his pocket.

Erik Sanchez, the Jack in the Box manager, was cleaning the dining area when he heard females shouting in the kitchen.  He entered the kitchen, where Velasquez's female coworkers said that she had been hit.  Velasquez and her two female coworkers went into an office, where they called 911.  From the office, they watched defendant make himself a sandwich and then eat it.

2

When Sanchez encountered defendant, defendant was eating the sandwich. Defendant threatened to kill Sanchez, saying he was from the Mafia. Defendant had a metal object in his hand at the time of the threat. Defendant punched Sanchez in the shoulder two times. Sanchez defended himself with a metal pot. Defendant then left with the sandwich.

Two Gilroy police officers arrived and contacted defendant a block away from the Jack in the Box. The officers ordered defendant to get on the ground. Both officers had their guns drawn. Defendant was eating a sandwich, and he "stared blankly" in response to the orders. Just as an officer deployed pepper spray, defendant lowered himself to the ground.

Defendant was handcuffed. An officer asked if he had any weapons. Defendant responded, "I have a knife in this pocket." The officer found a seven-inch thin metal object with a filed-down tip in defendant's shorts pocket.

### B.    Charges

Defendant was charged with two counts of second degree robbery (§§ 211, 212.5, subd. (c), counts 1 & 2), one count of assault with a deadly weapon (§ 245, subd. (a)(1), count 3), two counts of false imprisonment (§§ 236, 237; counts 4 & 5), and one count of carrying a concealed dirk or dagger (former § 12020, subd. (a)(4); count 6). The information alleged that defendant personally used a dangerous or deadly weapon in the commission of the robberies (§ 12022, subd. (b)(1)), that he had five prior "strike" convictions (§§ 667, subds. (b)-(i), 1170.12) and two prior serious felony convictions (§ 667, subd. (a)), and that he had served one prior prison term for a violent felony (§ 667.5, subd. (a)) and three other prior prison terms (§ 667.5, subd. (b)).

### C.    Guilt Phase of Trial:  Defendant's Testimony

Defendant testified that when he entered the Jack in the Box, he intended to "[p]anhandle" for money, which he needed for a place to stay that night. He also was hungry and wanted food. He did not want to appear to be a beggar so he said he was with

3

the Mafia, thinking it would make him look like a "Playboy." He thought he could talk the cashier into paying for his food or that she would give it to him for free. When Velasquez instead became upset, it angered defendant. He assumed she had already notified the police, so he wanted to "set matters straight" with her before the police arrived.

Defendant acknowledged that he went behind the counter and that he may have struck Velasquez. Defendant denied hitting Sanchez or threatening anyone, but he admitted possessing the metal object. Defendant admitted that he made himself a sandwich before leaving the restaurant. He was hungry and knew that he would soon be eating jail food.

The trial court found defendant guilty of the two robbery counts (counts 1 & 2) and found true the deadly weapon use allegations associated with count 2. The trial court also found defendant guilty of carrying a concealed dirk or dagger (count 6). However, the trial court found defendant not guilty of assault with a deadly weapon (count 3) and both false imprisonment counts (counts 4 & 5). Defendant admitted all of the prior conviction and prior prison term allegations.

### D.    *Sanity Phase of Trial:  Expert Testimony*

During the sanity phase of the trial, C. Mark Patterson, Ph.D testified on behalf of the defense, and John Robert Chamberlain, M.D. testified on behalf of the prosecution.

According to Dr. Patterson, defendant's primary diagnosis was "Schizophrenia Undifferentiated Type." Defendant also suffered from substance abuse disorders and antisocial personality disorder. Schizophrenia has two primary components: chronic delusional thinking and disorganized thought. Defendant's description of the incident showed that he was delusional at the time. He told Dr. Patterson that he was flirting with one or more of the female staff members and that he was involved in a gang rivalry that thwarted his efforts to flirt. Defendant also said that he was panhandling, not committing

4

a robbery. His description of the incident was scattered, and his references to the sexual dynamic and gang involvement indicated delusions and paranoia.

Dr. Patterson concluded that defendant was legally insane at the time of the offenses. In Dr. Patterson's opinion, defendant could not understand the nature and quality of the acts he committed. Defendant had an impaired or distorted understanding of reality as well as fractured thinking, which undermined his ability to synthesize thoughts and perceive the impact of his behavior on others.

Dr. Patterson also believed that defendant did not understand "the overall wrongfulness or moral wrongfulness of what his behavior was doing to the other people." Due to his delusional perceptions, defendant did not understand that he was causing harm to anyone.

Dr. Chamberlain diagnosed defendant as suffering from psychotic disorder, not otherwise specified, and mood disorder, not otherwise specified, along with various substance disorders. During an interview, defendant showed "paranoid ideation" and reported delusions and hallucinations.

Dr. Chamberlain believed defendant was sane at the time of the offenses. He opined that defendant was capable of knowing or understanding the nature and quality of his acts at the time of the offense, since "he was able to act in a goal directed manner to obtain his goal at that time," which was obtaining food from the restaurant. Specifically, when defendant "didn't get what he wanted," he became angry, intimidated staff, walked into the area of the restaurant where food was prepared, and made himself a sandwich. Additionally, defendant used a weapon in a "very goal directed fashion" when he was confronted. Dr. Chamberlain believed that while defendant exhibited a "level of entitlement," it was a "personality style" rather than something stemming from a psychotic condition.

Dr. Chamberlain also believed defendant's actions indicated he could distinguish right from wrong. Specifically, defendant used "a graded level" of behavior for getting

5

what he wanted. He first asked for the food he wanted, then yelled at the employee when he did not get it, then hit her. Once she was "out of the way," defendant made the sandwich. Upon being confronted by another employee, he produced a weapon and made threats. These actions showed defendant knew the employees were preventing him from getting what he wanted. Additionally, defendant did not "stick around at the scene of the offense" after using threats and violence. Finally, when the police arrived, defendant stopped, and although he did not initially comply with the officers' demands, he eventually did what he was "supposed to do."

### E. Sanity Phase of Trial: Arguments and Ruling

Based on the above testimony, defendant's counsel argued that the court should find defendant "could not distinguish moral right from wrong" at the time of the incident, "[g]iven that he was actively psychotic at the time" and "driven by hunger." He argued that defendant's "moral framework" required him to "take that food and feed himself." Defendant's counsel also argued that defendant did not know it was wrong "to carry a sharpened shank in his pocket for self protection."

The prosecutor argued that defendant was "capable of distinguishing the difference between what is morally right and what is morally wrong." The prosecutor discussed the expert testimony but urged the court to also consider the evidence at the guilt phase, including defendant's own testimony. The prosecutor argued that defendant "knew exactly what he was doing" at the time of the incident. The prosecutor argued that defendant had gone into the restaurant because he was hungry, ordered food, and used the weapon as necessary to get the food he wanted. The prosecutor argued when defendant continued to eat his sandwich upon being stopped by the police, defendant was not acting like "some psychotic person not knowing what was going on," but rather like someone who knew he was going to be arrested.

The trial court found defendant was sane at the time of the offenses. The court indicated that defendant's testimony at the guilt phase was "the key" to its determination.

The court referenced defendant's testimony about eating the sandwich because he knew he was going into police custody and defendant's description of the incident as "a panhandling gone bad."

The trial court found that defendant "knew the nature and quality of his acts," explaining: "He knew he was getting a sandwich. He knew where he was. . . . [¶] He knew by applying force to two separate people and the threat of a weapon, he was more likely to get the sandwich that he wanted because he was hungry . . . ."

The trial court also found that defendant "knew it was wrong," explaining: "He knew it was wrong because he told us he thought he was going to go to jail. He wasn't particularly surprised to see the police. He felt betrayed when the clerk called the police instead of giving him the Croissandwich that he wanted. That's something only happening when someone knows they're doing something that's wrong."

### F. Sentencing

On May 3, 2013, the trial court imposed a sentence of 50 years to life, consecutive to a determinate term of 31 years.

## III. DISCUSSION

Defendant contends the trial court used an incorrect standard in determining whether defendant was sane at the time of the offenses, and that he was prevented from presenting a complete insanity defense.

"The test of legal insanity in California is the rule in *M'Naghten's Case* (1843) 10 Clark & Fin. 200, 210 [8 Eng.Rep. 718, 722], as adopted by the electorate in June 1982 with the passage of Proposition 8. That measure added section 25, subdivision (b), which provides: 'In any criminal proceeding . . . in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing

7

right from wrong at the time of the commission of the offense.'  Despite the use of the conjunctive 'and' instead of *M'Naghten's* disjunctive 'or,' [the California Supreme Court] has interpreted the statute as recognizing two distinct and independent bases on which a verdict of not guilty by reason of insanity might be returned.  [Citations.]" (*People v. Lawley* (2002) 27 Cal.4th 102, 169-170, fn. omitted.)

A defendant who pleads not guilty by reason of insanity "has the burden of proof on that issue."  (Evid. Code, § 522.)  Thus, to establish an insanity defense, the defendant must prove, by a preponderance of the evidence, that at the time of the commission of the offense, he or she was incapable of either (1) knowing or understanding the nature and quality of his or her act or (2) distinguishing right from wrong.

Regarding the second prong of the insanity test, the question is "whether a defendant can distinguish, not the legal rightness or wrongness of his [or her] act, but its moral rightness or wrongness."  (*People v. Stress* (1988) 205 Cal.App.3d 1259, 1272 (*Stress*).)  "Thus, if a person is incapable, because of a mental disease or defect, of understanding that his [or her] actions are morally wrong—that is, in violation of generally accepted standards of moral obligation—then that person is legally insane, regardless of whether he [or she] knows his [or her] actions are illegal.  [Citation.]" (*People v. Severance* (2006) 138 Cal.App.4th 305, 323; see also *People v. Skinner* (1985) 39 Cal.3d 765, 783 (*Skinner*) ["a defendant who is incapable of understanding that his act is morally wrong is not criminally liable merely because he knows the act is unlawful"].) "While . . . in most instances legal wrongfulness and moral wrongfulness are equivalent, this is not always the case [citations] and a defendant is free to argue, in the terms of section 25, subdivision (b), that while he [or she] was able to distinguish between legal right and wrong he [or she] could not distinguish between moral right and wrong." (*Stress, supra,* at p. 1275.)

Defendant first contends that the trial court erroneously believed that defendant was sane solely because defendant knew that his actions were legally wrong.  Defendant

contends the trial court's "misunderstanding of the law" was demonstrated by its remarks about how defendant "knew it was wrong because he told us he thought he was going to go to jail" and how defendant "wasn't particularly surprised to see the police."

Contrary to defendant's claim, the record fails to rebut the presumption that the trial court knew and applied the "correct statutory and case law" regarding insanity.  (See *People v. Coddington* (2000) 23 Cal.4th 529, 644, overruled on other grounds by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)  Significantly, no evidence at the guilt phase of trial—including defendant's own testimony—suggested that defendant believed it was morally right to commit a legal wrong.  (Compare, e.g., *People v. Torres* (2005) 127 Cal.App.4th 1391, 1402 ["Defendant offered evidence that he was suffering under the delusion that doctors were injecting him and others with lethal materials and that he felt morally justified in killing doctors to protect himself and others."]; *Stress, supra,* 205 Cal.App.3d at p. 1265 [defendant believed killing of his wife was "necessary to save the lives of untold future generations"].)  Moreover, throughout the sanity phase of the trial, the attorneys and witnesses repeatedly referred to moral wrong as distinct from legal wrong.  On this record, and because "in most instances legal wrongfulness and moral wrongfulness are equivalent" (*Stress, supra,* at p. 1275), we do not agree that the trial court's comments reflect a misunderstanding of the legal standard for an insanity defense.

Defendant next contends the trial court erred by finding defendant sane based on defendant's understanding that it was wrong to panhandle.  Defendant argues the trial court should have focused on whether or not defendant knew it was wrong to use force and violence to obtain the sandwich.  Again, we disagree that the trial court's comments reflect a misunderstanding of defendant's testimony.  Defendant testified that he assumed Velasquez had called the police after he refused to pay and said he was with the Mafia, but he also testified that he knew he would be going to jail after he used force and violence to obtain the sandwich.  Thus, the trial court's comments about defendant

9

believing he was "going to go to jail" and not being "particularly surprised to see the police" indicate the trial court found that defendant understood it was wrong to use force and violence to obtain the sandwich.

Defendant's next claim is that the trial court erred by applying "the 'wild beast' test specifically disavowed by our Supreme Court" in *Skinner, supra,* 39 Cal.3d 765. The " 'wild beast test,' " also known as the " 'good and evil test,' " was the law prior to *M'Naghten's Case.* (*Id.* at p. 777.) Under that test, "an accused could be found insane only if he [or she] was 'totally deprived of his [or her] understanding and memory, and doth not know what he [or she] is doing, no more than an infant, than a brute, or a wild beast. . . .' [Citation.]" (*Ibid.*, fn. omitted.)

According to defendant, the trial court's error is shown by its finding that defendant "knew where he was." We do not agree that this finding demonstrates a misapplication of the law. The trial court made this finding in the context of finding that defendant "knew the nature and quality of his acts." The court's remarks indicate it found that defendant was not under a delusion that he was somewhere else or that he was doing something else but that, instead, defendant knew he was getting a sandwich at a restaurant and using force and a threat to get the sandwich when it was not given to him. The remarks do not indicate the court applied an improper test for determining defendant's sanity.

Defendant next contends the trial court's finding of sanity was based on the speculation and conjecture of the prosecution's expert, Dr. Chamberlain. Defendant contends that the determination of sanity "requires an examination of what the defendant was actually thinking at the time he committed the charged crimes" and thus cannot be based solely on expert testimony. Defendant relies on *People v. Wolff* (1964) 61 Cal.2d 795, 811 (*Wolff*), abrogated by statute on other grounds as stated in *People v. Bloom* (1989) 48 Cal.3d 1194, 1211, which held that psychiatric testimony is not necessarily conclusive on the issue of legal sanity.

10

Nothing in the record supports defendant's claim that the trial court found defendant sane based solely on the testimony of Dr. Chamberlain. In fact, the record shows that the trial court found that defendant's testimony at the guilt phase—i.e., evidence of what he was actually thinking at the time of the offenses—was "the key" to its determination. The trial court cited to defendant's testimony, not Dr. Chamberlain's, in explaining why it found defendant did not meet either prong of the insanity test. Thus, the trial court did not err in this regard.

To a large extent, the above claims of trial court error are essentially an attack on the sufficiency of the evidence to support the trial court's finding of sanity. "[T]he substantial evidence test applies to appellate review of a sanity determination [citation]." (*People v. Chavez* (2008) 160 Cal.App.4th 882, 891.) Here there was substantial evidence to support the trial court's determination that defendant was sane at the time of the offenses, and specifically that defendant had the ability to distinguish right from wrong. As noted above, none of the evidence at the guilt phase, including defendant's own testimony, indicated that defendant's acts were based on what he believed was morally "right" at the time. The only such evidence at the sanity phase came from defendant's expert, Dr. Patterson, who testified that defendant did not understand that he was causing harm due to his delusional perceptions. But that testimony was contradicted by the prosecution's expert, Dr. Chamberlain, who explained that defendant's behavior graduated to violence only when he did not get what he wanted. Thus, the record contains substantial evidence to support the trial court's finding of sanity.

Defendant's final claim is that he was prevented from presenting a complete insanity defense because it was impossible to show that he could not distinguish right from wrong except by way of expert conjecture, which is not necessarily conclusive under *Wolff, supra,* 61 Cal.2d 795. We disagree that defendant was limited to presenting expert testimony on the issue of his ability to distinguish right from wrong at the time of the offense. Evidence of defendant's ability to distinguish right from wrong was shown

by circumstantial evidence (his actions and statements at the time of the offense) as well as by direct evidence (his own testimony). Defendant was not precluded from presenting a complete insanity defense.

## IV.  DISPOSITION

The judgment is affirmed.

_____

BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____

MIHARA, J.

_____

GROVER, J.