Filed 2/21/24  P. v. Romero CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G062175 |
| v. | (Super. Ct. No. 21NF2286) |
| JOSUE ALEJANDRO ROMERO, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Michael A. Leversen, Judge.  Affirmed.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel J. Hilton and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

After ingesting methamphetamine at a bar, defendant Josue Alejandro Romero became angry that a man had molested his ex-girlfriend when she was a child, and he grew concerned for her safety and the safety of their newborn daughter. Romero walked to the man's house with the express intent to kill him. After entering the house, Romero stabbed the man multiple times in the neck, shoulder, and face. A jury convicted Romero of attempted murder and found he had deliberated and premeditated the crime.

Romero asserts the trial court erred in failing to give three sua sponte jury instructions on provocation and hallucination. We disagree. The instructions at issue are pinpoint instructions, so the court was not required to give them absent a request. Because Romero did not request those instructions, he failed to preserve his claims for appeal.

Anticipating this response, Romero alternatively asserts his trial counsel rendered ineffective assistance by failing to request the instructions. Again, we are not persuaded. Given the record and his various admissions regarding intent and planning, Romero cannot demonstrate the omission of the instructions prejudiced him. We therefore affirm the judgment.

## FACTS

Romero and A.M. started dating in about 2018. Around that time, A.M. told Romero her mother's long-term boyfriend, Luis, had sexually abused A.M. when she was a child. A.M. mentioned the molestation to Romero only on that one occasion.

Romero and A.M. had two children together, including a daughter born in early July 2021. A.M. and the children lived with A.M.'s mother and Luis at their home in Placentia, while Romero lived either at his parents' house or on the streets. Romero and A.M.'s relationship was "on and off," and according to Romero, they broke up a few days before the incident in question, which occurred on July 22, 2021.

2

That afternoon, Romero was drinking vodka at a bar in Fullerton. He then swallowed a rock of methamphetamine, which he had been using "frequently" since he was a teenager.

While sitting in the bar under the influence of methamphetamine, Romero recalled that Luis had molested A.M. when she was a little girl, and a feeling came over him that his two-week-old daughter, and perhaps even A.M., were in danger. Romero also recently had become concerned Luis was still forcing himself sexually on A.M. Romero had not observed any contact or touching between Luis and A.M.; in his words, it was just an "intuition."

Still feeling the effects of the methamphetamine, Romero walked to the house where A.M. lived with the children, her mother, and Luis. Romero later testified that during that five-minute walk, he thought about "a lot of things," including the need to "hurt" and "discipline[ ]" Luis for molesting A.M., and his "intention to kill" Luis to defend his family. Romero also thought about the fact he did not have a gun, but he had a knife in his pocket and thought there might be a hammer in the backyard.

When Romero arrived at the house, he found Luis, A.M.'s mother, and Romero's newborn daughter in one of the bedrooms. A.M.'s mother was lying on the bed, and Luis and the baby were on the floor. According to Romero, Luis was "touching" the child.

Romero moved the baby onto the bed next to A.M.'s mother. He then pulled the knife out of his pocket and stabbed Luis repeatedly in the neck; he also punched and choked him. Romero testified that all the while, he was thinking about how Luis needed to be disciplined and killed and that he needed to protect his daughter. He also admitted he had "the intent to kill" Luis as he was stabbing him.

After the attack, Romero left the house. Luis, who had stab wounds and lacerations on his face, neck, and left shoulder, was taken to the hospital where he underwent surgery.

3

Police arrested Romero in Fullerton early the next morning. After waiving his *Miranda*[1] rights, Romero told officers when he first met A.M., she mentioned that Luis touched her when she was a young child. He also told officers he had grown suspicious of Luis and thought Luis had recently given A.M. a bouquet of flowers.[2] Romero described how on the day of the incident, as he was sitting at the bar, a feeling came over him that Luis should pay for the fact he was a "piece of shit" and a "child molester," and after thinking it over for about two to four hours, he decided to kill Luis, either with his bare hands or with his knife.[3] He recounted that he walked to the residence, pulled out his knife, and "stabbed [Luis] as many times in the neck as [he] could" and "fought . . . to take his life."

While Romero was in jail, he had several recorded telephone conversations with A.M. During one conversation, Romero told A.M. he did what he did because he is "a soldier of [G]od" (meaning he had to "protect[ ] others from harm") and he "felt like a higher being [was] telling [him] to do" it. However, he also told A.M., "I'm not crazy[,] you know I'm not crazy but I felt like I had to do that. . . . [¶] . . . [¶] Nobody told me to do that, I did it myself." During another telephone conversation, Romero asked A.M. to bring him case law on attempted murder, explaining he wanted to find a "loophole."

At trial, Romero's defense counsel argued Romero was provoked to attack Luis in three respects: (1) A.M. told Romero that Luis had molested her as a child; (2) the flower delivery caused Romero to suspect Luis was trying to "make a move" on

[1] See *Miranda v. Arizona* (1996) 384 U.S. 436.

[2] At trial, A.M. testified that her insurance company had sent her the flowers because she had been in a car accident while pregnant with her daughter.

[3] At trial, Romero denied thinking about the assault for that long and claimed he was "disoriented because of the drugs and alcohol" when the police interviewed him. He testified he was at the bar for at most 20 minutes and then spent about five to seven minutes walking to A.M.'s house.

A.M.; and (3) Romero believed he saw Luis "touching" his newborn child immediately before the stabbing. According to counsel, this all led Romero, who was high on methamphetamine, to act rashly.

The jury found Romero guilty of attempted murder, first degree residential burglary, and assault with a deadly weapon; it also found true that Romero committed the attempted murder with deliberation and premeditation, personally inflicted great bodily injury, and personally used a deadly weapon.

The trial court found Romero had been previously convicted of a serious felony that was also a strike and sentenced him to 18 years to life in prison. Romero filed a notice of appeal.

## DISCUSSION

Romero's appeal focuses exclusively on the trial court's failure to give three sua sponte jury instructions concerning his state of mind at the time of his crimes. Before addressing his arguments, we provide some further background.

"First degree murder is an unlawful killing with malice aforethought, premeditation, and deliberation"; "[s]econd degree murder is an unlawful killing with malice, but without . . . premeditation or deliberation"; and voluntary manslaughter is an unlawful intentional killing without malice, premeditation, or deliberation. (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332.) Provocation can operate to reduce first degree murder to second degree murder by negating premeditation and deliberation; it can also operate to reduce second degree murder to voluntary manslaughter by negating the existence of malice. (*Ibid.*)

The trial court instructed the jury with CALCRIM No. 603, which explains that "[a]n attempted killing that would otherwise be attempted murder is reduced to attempted voluntary manslaughter if the defendant attempted to kill someone because of a sudden quarrel or in the heat of passion." The court also instructed the jury with

5

CALCRIM No. 625, which explains that the jury may consider evidence of the defendant's voluntary intoxication only for the limited purpose of deciding whether the defendant acted with an intent to kill or with deliberation and premeditation.

Romero argues the trial court should have *also* instructed the jury on how the evidence of Luis's molestation was relevant to provocation, that provocation insufficient to reduce the offense to manslaughter might nonetheless be sufficient to reduce it to second degree murder, and that hallucination may negate deliberation and premeditation so as to reduce the offense to second degree murder. Recognizing his counsel did not request any of these instructions at trial, Romero contends the court had a sua sponte duty to give these instructions, and its failure to do so deprived him of a fair trial. In the alternative, Romero argues his trial counsel was constitutionally ineffective in failing to request those instructions. We are not persuaded.

1.  *The Failure to Instruct on the Molestation Evidence's Relevance to Provocation*

As noted, the jury heard evidence that when A.M. and Romero first started dating, A.M. told Romero that Luis had molested her as a child. Romero contends the trial court erred by not instructing the jury about the molestation evidence's relevance to his provocation defense. He acknowledges the court did admonish the jury that the evidence of molestation could only be used in considering Romero's specific mental state and whether he acted with deliberation and premeditation, but asserts the court should have also instructed the jury that evidence of molestation was relevant to whether Romero was provoked or acted in the heat of passion. According to Romero, without further elaboration, the jury did not know the molestation may be a mitigating factor for Romero, as opposed to evidence of a motive to murder Luis.

We find no error. To begin with, a trial court has no sua sponte duty to give a pinpoint instruction concerning particular facts relevant to the crux of the defendant's case. (*People v. Jennings* (2010) 50 Cal.4th 616, 674-675.) That is precisely

6

what Romero is advocating for here. Because he never asked the court to explain the relevance of the molestation as to provocation, he forfeited the issue.

Nor can we say defense counsel was constitutionally ineffective in failing to request such an instruction or that Romero was prejudiced by the instruction's absence. Although counsel was not asked why he did not request an instruction on the relevance of the molestation evidence, counsel likely had tactical reasons for focusing instead on more recent events (i.e., the giving of flowers and the apparent "touching" of Romero's daughter) to support Romero's provocation defense. Romero had known about the molestation for at least three years by the time of his crimes. The only time he and A.M. had ever discussed the molestation was in 2018 when they started dating, which gave Romero more than ample time to "cool off." (See CALCRIM No. 603 ["If enough time passed between the provocation and the attempted killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the attempted murder is not reduced to attempted voluntary manslaughter on this basis"].) The time lapse, coupled with Romero's admissions at trial that he formed an intent to kill Luis while still at the bar and began deliberating murder weapons during his walk to the house, convinces us that even if the trial court had instructed the jury on the relevance of the molestation evidence, the result would have been same.

2. *The Failure to Instruct that Provocation Can Reduce Deliberate Premeditated Attempted Murder to Attempted Murder*

As noted, the trial court instructed the jury that an attempted killing that would otherwise be attempted murder is reduced to attempted voluntary manslaughter if the defendant attempted to kill someone in the heat of passion. (CALCRIM No. 603.) According to Romero, the court should have also given a modified version of CALCRIM No. 5.22 to the jury: "[w]hen the evidence shows the existence of provocation that played a part in inducing the unlawful attempted murder of a human being, but also shows that such provocation was not such as to reduce the offense to attempted voluntary

7

manslaughter, and you find that the offense was attempted murder, you may consider the evidence of provocation for such bearing as it may have on the question of whether the attempted murder was premeditated and deliberate."

Again, we disagree. First, instructions on provocation are pinpoint instructions, so the trial court had no sua sponte duty to give the modified instruction absent a request. (*People v. Hardy* (2018) 5 Cal.5th 56, 99 ["Instructions on provocation are pinpoint instructions that need not be given sua sponte but only on request"].) Because Romero did not request the instruction, he forfeited the argument on appeal.

Second, Romero has not shown prejudice from the omission of the instruction. As explained above, both the molestation and Romero's discovery of the molestation occurred years earlier. And although defense counsel attempted to use more recent events to support Romero's provocation defense, such as the flower delivery and seeing Luis "touching" the baby, the jury found these events were insufficient to negate premeditation and deliberation. Romero admitted he formed an intent to kill Luis while at the bar and began deliberating his options for murder weapons during his walk over to the house, *before* he purportedly saw Luis "touching" his newborn daughter. On this record, we discern no prejudice.

3. *The Failure to Instruct on Voluntary Hallucination*

Finally, Romero contends the trial court erred by not giving an instruction about voluntary hallucination or delusion. Although the court did instruct the jury it could consider Romero's voluntary intoxication for the limited purposes of deciding whether he acted with an intent to kill or with deliberation and premeditation (CALCRIM No. 625), Romero asserts the court should have also instructed the jury it could consider evidence of hallucinations in deciding whether Romero acted with deliberation and premeditation (CALCRIM No. 627). According to Romero, if properly instructed, the jury might have concluded Romero was hallucinating when he thought Luis was a threat

8

to A.M. or when he saw Luis "touching" Romero's newborn daughter, and this hallucination fueled his passion and subjectively negated premeditation and deliberation.

Again, we are not persuaded. First, as Romero acknowledges, CALCRIM No. 627 is a pinpoint instruction to be given only on request when the evidence supports the theory. (See *People v. Ervin* (2000) 22 Cal.4th 48, 91; *People v. McCarrick* (2016) 6 Cal.App.5th 227, 243.) Because Romero did not request this instruction, he failed to preserve his claim for appeal.

Second, Romero was not prejudiced by the omission of the instruction because nothing in the record suggests any delusional perception of reality resulted in his failure to plan or consider his actions. (See *People v. Stress* (1988) 205 Cal.App.3d 1259, 1270 ["A finding of deliberation and premeditation is not negated by evidence a defendant's mental condition was abnormal or his perception of reality delusional unless those conditions resulted in the failure to plan or weigh considerations for and against the proposed course of action"].) To the contrary, Romero testified that he formed an intent to kill Luis while at the bar and began considering his options for murder weapons during his walk over to the house, *before* he purportedly saw (or imagined) that Luis was "touching" his newborn daughter.

Further, the trial court instructed the jury it could consider whether Romero's voluntary intoxication affected his ability to form a specific intent or to premeditate and deliberate; the jury rejected Romero's argument that his methamphetamine use affected his ability to deliberate and premeditate. We can therefore conclude with confidence that the jury, even if instructed on hallucination, would have found Romero premeditated and deliberated his actions. We find no reasonable probability of a different outcome had the instruction been given.

9

## DISPOSITION

The judgment is affirmed.

                                           GOETHALS, ACTING P. J.

WE CONCUR:


DELANEY, J.


GOODING, J.